## ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 21-1192 and 21-1274 (consolidated)

HECATE ENERGY GREENE COUNTY 3 LLC,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

———————————————

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

———————————————

## BRIEF OF INTERVENOR NEW YORK INDEPENDENT SYSTEM OPERATOR, INC.

———————————————

C. Dixon Wallace III
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
dwallace@huntonak.com

John Lee Shepherd, Jr.
Ted J. Murphy
Brian M. Zimmet
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@huntonak.com
tmurphy@huntonak.com
bzimmet@huntonak.com

*Counsel for New York Independent System Operator, Inc.*

June 30, 2022

## <u>CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES</u>

**A.    Parties**

All parties appearing before the Federal Energy Regulatory Commission and

this Court are listed in the Petitioner's brief.

**B.    Rulings Under Review:**

1.     *Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, Docket No. EL21-49-000, "Order Denying Complaint," 176 FERC ¶ 61,023 (July 15, 2021);

2.     *Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, Docket No. EL21-49-001, "Notice of Denial of Rehearing by Operation of Law and Providing for Further Reconsideration," 176 FERC ¶ 62,124 (Sept. 13, 2021); and

3.     *Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, Docket No. EL21-49-001, "Order Addressing Arguments Raised on Rehearing," 177 FERC ¶ 61,121 (Nov. 18, 2021).

**C.    Related Cases**

Counsel is not aware of any related cases previously before this Court or any

other court, or pending in this Court or in any other court.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for New York Independent System Operator, Inc.*

i

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and D.C. Circuit Rule 26.1, Intervenor New York Independent System Operator (NYISO) makes the following disclosures:

NYISO is a not-for-profit corporation organized and existing under the laws of New York.  Although NYISO does not own or control any electric power generation facilities, it possesses operational control over certain electric transmission facilities in New York State and issues commitment and dispatch instructions to electric power generation facilities.  NYISO is the independent body responsible for providing open access transmission service, maintaining reliability, and administering competitive wholesale electricity markets in New York State. NYISO also engages in planning for the high-voltage transmission system in New York, and oversees the allocation of costs for certain transmission projects planned through NYISO's processes.

NYISO is not a publicly held company.  It does not have a parent company, and no publicly held company has a 10% or greater ownership in it.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for New York Independent System Operator, Inc.*

ii

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ............. i

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF AUTHORITIES .................................................................................. v

GLOSSARY OF ABBREVIATIONS ................................................................... ix

INTRODUCTION ................................................................................................. 1

COUNTERSTATEMENT OF JURISDICTION ................................................... 3

STATEMENT OF ISSUES .................................................................................. 4

STATUTES AND REGULATIONS ..................................................................... 4

STATEMENT OF FACTS ................................................................................... 5

      A.    Statutory Overview ............................................................... 5

      B.    New York Independent System Operator (NYISO) ............. 7

      C.    Small Generator Interconnections in New York ................. 11

      D.    NYISO's Application of the Small Generator Interconnection Procedures to Hecate ............................................................. 14

SUMMARY OF THE ARGUMENT ................................................................... 17

STANDARD OF REVIEW ................................................................................. 19

ARGUMENT ...................................................................................................... 19

I.      Hecate Waived Arguments Necessary to Retain Standing on Review ........ 19

II.     Hecate's New Arguments Regarding NYISO OATT Attachments S and Z are Baseless and Were Waived when Hecate Failed to Raise Them on Rehearing ........................................................................................ 23

      A.    NYISO's Recognition of Central Hudson's Existing System in its Base Case for Hecate's Interconnection Study Did Not Violate Attachment Z, Section 32.1.6 ................................................. 26

      B.    NYISO's Recognition of Central Hudson's Existing System in its Base Case for Hecate's Interconnection Study Did Not Violate—But Was Instead Required By—Attachment S, Section 25.5.5.1 ..................................................................... 28

III.    FERC Reasonably Concluded that Central Hudson's Inclusion Practice Need Not Be Expressly Incorporated in the NYISO Tariff ........... 29

A.     Hecate's Rule of Reason Claims Are Fundamentally
       Misleading Because They Understate Both the Specificity and
       Complexity of NYISO's Filed Interconnection Procedures ...............30

B.     Expressly Incorporating Central Hudson's Inclusion Practice
       into the NYISO OATT Would Be Illogical, Potentially
       Unlawful, and Would Make It Impractical for NYISO to
       Administer its Interconnection Procedures .........................................34

C.     Hecate's Approach to the Rule of Reason Would Threaten to
       Make the Implementation of NYISO's Interconnection
       Procedures, and of Other Complex Tariff Mechanisms, Totally
       Unworkable .........................................................................................40

CONCLUSION ................................................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

TARIFF ADDENDUM

Relevant Excerpts from the NYISO Tariff, Definitions                    A-1

Relevant Excerpts from the NYISO Tariff, Attachment S                   A-2

Relevant Excerpts from the NYISO Tariff, Attachment X                   A-11

Relevant Excerpts from the NYISO Tariff, Attachment Y                   A-14

Relevant Excerpts from the NYISO Tariff, Attachment Z                   A-17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BDPCS, Inc. v. FCC*, 351 F.3d 1177 (D.C. Cir. 2003)......................................21, 22

*California ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831 (9th Cir. 2004) ............................................................................................................4, 5

*California Independent System Operator Corp. v. FERC*, 372 F.3d 395 (D.C. Cir. 2004) ........................................................................................7

*City of Cleveland v. FERC*, 773 F.2d 1368 (D.C. Cir. 1985).....................6, 29, 34

*Consolidated Edison Co. of New York v. FERC*, 347 F.3d 964 (D.C. Cir. 2003) ..................................................................................................8

*Detroit Edison Co. v. FERC*, 334 F.3d 48 (D.C. Cir. 2003).................................38

*Doe v. McAleenan*, 929 F.3d 478 (7th Cir. 2019)....................................................22

*FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016)...................................6

*Fogo De Chao (Holdings) Inc. v. U.S. Department of Homeland Security*, 769 F.3d 1127 (D.C. Cir. 2014)............................................................21

*In re FirstEnergy Solutions Corp.*, 945 F.3d 431 (6th Cir. 2019) ............................5

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................4, 23

*Mendez-Alcaraz v. Gonzalez*, 464 F.3d 842 (9th Cir. 2006) ..................................23

*National Ass'n of Regulatory Utility Commissioners v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007)......................................................................8 n.3, 38

*New York Regional Interconnect, Inc. v. FERC*, 634 F.3d 581 (D.C. Cir. 2011) ........................................................................................................7

*Northern Virginia Electric Cooperative, Inc. v. FERC*, 945 F.3d 1201 (D.C. Cir. 2019) ..................................................................................4, 24

*Authorities chiefly relied upon are marked with an asterisk.

*Piedmont Environmental Council v. FERC*, 558 F.3d 304 (4th Cir. 2009) ..................................................................................................7

*Power Co. of America v. FERC*, 245 F.3d 839 (D.C. Cir. 2001) ............................21

*Save Our Sebasticook v. FERC*, 431 F.3d 379 (D.C. Cir. 2005).............................24

*VHV Jewelers, LLC v. Wolf*, 17 F.4th 109 (11th Cir. 2021)...................................23

*Xcel Energy Services, Inc. v. FERC*, 510 F.3d 314 (D.C. Cir. 2007)......................21

**Statutes**

Federal Power Act (FPA), 16 U.S.C. §§ 791-825r

Federal Power Act section 201, 16 U.S.C. § 824 ......................................5, 38

Federal Power Act section 205, 16 U.S.C. § 824d. 5, 6, 18, 19, 29, 33, 34, 36

Federal Power Act section 206, 16 U.S.C. § 824e .................2, 17, 19, 20, 21

Federal Power Act section 216, 16 U.S.C. § 824p ........................................7

Federal Power Act section 313, 16 U.S.C. § 825*l*.........................................24

**Agency Decisions**

*Central Hudson Gas & Elec. Corp.*, 83 FERC ¶ 61,352 (1998) ..........................8, 9

*\*Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, 176 FERC ¶ 61,023 (2021) (Complaint Order)....2, 3, 10, 13, 14, 20, 21, 22, 24, 25 n.7, 26, 27, 28, 29, 36, 39

*Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, 176 FERC ¶ 62,124 (2021) ..........................................................2

*\*Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, 177 FERC ¶ 61,121 (2021) (Rehearing Order) ..3, 20, 21, 22, 24, 26, 27, 28, 36

*ISO New England, Inc.*, 115 FERC ¶ 61,050 (2006)................................................39

*ISO New England, Inc.*, 154 FERC ¶ 61,008 (2016)................................................32

*Authorities chiefly relied upon are marked with an asterisk.

*Midcontinent Independent System Operator, Inc.*, 152 FERC ¶ 61,073 (2015)................................................................................................32

*New York Independent System Operator, Inc.*, 179 FERC ¶ 61,102 (2022)................................................................................................33

*\*New York Independent System Operator, Inc. & New York Transmission Owners*, 118 FERC ¶ 61,130 (2007) ...........................................38

*Pacific Gas & Electric Co.*, 5 FERC ¶ 61,305 (1978)...............................................6

*PacifiCorp*, 127 FERC ¶ 61,144 (2009) .................................................................32

*PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134 (2020)................................32, 33

*Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Group v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).........................................11, 12

*Southwest Power Pool, Inc.*, 136 FERC ¶ 61,050 (2011) .......................................33

*Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. National Ass'n of Regulatory Utility Commissioners v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) ...........................................................8, 12

*Standardization of Small Generator Interconnection Agreements and Procedures*, Order No. 2006, 111 FERC ¶ 61,220, *order on reh'g*, Order No. 2006-A, 113 FERC ¶ 61,195 (2005), *order granting clarification*, Order No. 2006-B, 116 FERC ¶ 61,046 (2006)...........................38

\*Authorities chiefly relied upon are marked with an asterisk.

**Tariff Provisions**

NYISO Tariff, § 1.13 ..........................................................................28 n.9

NYISO Tariff, Attach. S, § 25.1.2 ..............................................................35

*NYISO Tariff, Attach. S, § 25.5.5.1 ............................................22, 25, 26, 28, 39

NYISO Tariff, Attach. S, § 25.5.9.1 ............................................................15

NYISO Tariff, Attach. X, § 30.2.3 ..............................................................26

NYISO Tariff, Attach. Y, § 31.2.2.3.2 ..........................................................35

NYISO Tariff, Attach. Z, § 32.1.6..................................................15, 24, 26, 27, 28

NYISO Tariff, Attach. Z, § 32.3.4.2 ............................................................15

NYISO Tariff, Attach. Z, § 32.3.5.2 ............................................................15

NYISO Tariff, Attach. Z, § 32.3.5.3.2 ......................................................15, 26

**Other Authorities**

18 C.F.R. § 141.300 ............................................................................35

Consolidated Edison Company of New York, Inc., Form 10-K Annual
    Report for the Fiscal Year Ended Dec. 31, 2021 (Feb. 17, 2022) .................9 n.4

NYISO, *Local Transmission Owner Planning Process* (LTPP) ....................36 n.12

NYISO, NYISO Interconnection Queue 4/30/22 (Apr. 30, 2022) ........................31

NYISO, Order No. 2006 Compliance Electric Rate Filing, Docket No.
    ER06-311-000 (filed Dec. 8, 2005) ....................................................39

NYISO, Quarter 1 of 2022 – Large Facility Interconnection Study
    Metrics (Apr. 29, 2022) ............................................................31, 32

*Authorities chiefly relied upon are marked with an asterisk.

# GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| Base Case | Defined in the NYISO Tariff, Attachment Z, as: "[t]he base case power flow, short circuit, and stability data bases used for the Interconnection Studies by the ISO, Connecting Transmission Owner or Interconnection Customer; described in Section 30.2.3 of the Large Facility Interconnection Procedures." |
| Central Hudson | Central Hudson Gas & Electric Corp. |
| Class Year | Defined in the NYISO Tariff, Attachment Z, as: "the group of Projects included in any particular Class Year Interconnection Facilities Study (Annual Transmission Reliability Assessment and/or Class Year Deliverability Study), in accordance with the criteria specified in Attachment S and in Attachment Z for including such Projects." |
| Climate Act | New York Climate Leadership and Protection Act |
| Commission | Federal Energy Regulatory Commission |
| Complaint Order | *Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, 176 FERC ¶ 61,023 (2021) |
| Connecting Transmission Owner | Defined in the NYISO Tariff, Attachment Z, as: "[t]he New York public utility or authority (or its designated agent) that: (i) owns facilities used for the transmission of Energy in interstate commerce and provides Transmission Service under the Tariff, (ii) owns, leases or otherwise possesses an interest in the portion of the New York State Transmission System or Distribution System at the Point of Interconnection, and (iii) is a Party to the |

| | |
|---|---|
| | Standard Small Generator Interconnection Agreement." |
| Distribution System | Defined in the NYISO Tariff, Attachment Z, in relevant part as: "[t]he Transmission Owner's facilities and equipment used to distribute electricity that are subject to FERC jurisdiction, and are subject to the ISO's Large Facility Interconnection Procedures in Attachment X to the ISO OATT or Small Generator Interconnection Procedures in Attachment Z to the ISO OATT under FERC Order Nos. 2003 and/or 2006." |
| FERC | Federal Energy Regulatory Commission |
| FERC Form 715 | Annual transmission planning and evaluation report that each transmitting utility that operates integrated transmission system facilities rated at or above 100 kV must annually submit to FERC |
| FPA | Federal Power Act |
| Gold Book | NYISO Load and Capacity Data Report, defined in the NYISO Tariff, Attachment S as: "[t]he annual ISO survey of power demand and supply in New York State, published pursuant to Section 6-106 of the Energy Law of New York State." |
| Good Utility Practice | Defined in the NYISO Tariff, Attachment Z, in relevant part as: "[a]ny of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent |

|  | with good business practices, reliability, safety and expedition." |
|---|---|
| Hecate | Hecate Energy Greene County 3 LLC |
| Inclusion Practice | The rule applied by Central Hudson to determine when to include Non-Jurisdictional Projects in the data it provides to NYISO for its use in conducting interconnection studies |
| Interconnection Customer | Defined in the NYISO Tariff as: "[a]ny entity, including the Connecting Transmission Owner or any of its affiliates or subsidiaries, that proposes to interconnect its Small Generating Facility with the New York State Transmission System or the Distribution System." |
| Interconnection Request | Defined in the NYISO Tariff, Attachment Z, in relevant part as: "[t]he Interconnection Customer's request, in accordance with these procedures, (i) to interconnect a new Small Generating Facility to the New York State Transmission System or the Distribution System, or (ii) to materially increase the capacity of, or make a material modification to the operating characteristics of, an existing Small Generating Facility that is interconnected to the New York State Transmission System or the Distribution System." |
| Interconnection Study | Defined in the NYISO Tariff, Attachment Z, as: "[a]ny study required to be performed under Sections 32.2 or 32.3 of the [Small Generator Interconnection Procedures]." |
| Large Facility Interconnection Procedures | NYISO procedures applicable to generators with a capacity greater than 20 MW, as provided in NYISO Tariff, Attachment X |

| | |
|---|---|
| LTPP | Local Transmission Owner Planning Process; defined in the NYISO Tariff, Attachment Y as "[t]he Local Planning Process conducted by each Transmission Owner for its own Transmission District." |
| Market Participant | Defined in the NYISO Tariff, as: "[a]n entity, excluding the ISO, that produces, transmits, sells, and/or purchases for resale Capacity, Energy and Ancillary Services in the Wholesale Market. Market Participants include: Transmission Customers under the ISO OATT, Customers under the ISO Services Tariff, Power Exchanges, Transmission Owners, Primary Holders, LSEs, Suppliers and their designated agents. Market Participants also include entities buying or selling TCCs." |
| NYSSIR Process | New York State Standardized Interconnection Requirements and Application Process; rules governing requests by small generators to interconnect at the distribution level |
| Non-Jurisdictional Distributed Generation Projects | Small generators that interconnect to distribution-level facilities and that are not subject to the Large Facility Interconnection Procedures or Small Generator Interconnection Procedures |
| Non-Jurisdictional Interconnection Rules | New York State Standardized Interconnection Requirements |
| Non-Jurisdictional Projects | Small projects (5 megawatts or less) entitled to interconnect to distribution facilities pursuant to the NYSSIR Process |
| NYISO | New York Independent System Operator, Inc. |
| NYISO Tariff | NYISO Open Access Transmission Tariff |

| | |
|---|---|
| NYSSIR Process | New York State Standardized Interconnection Requirements and Application Process; rules governing requests by small generators to interconnect at the distribution level |
| NYSSIR Projects | The six projects that submitted interconnection requests through the New York State Standardized Interconnection Requirements and Application Process between April 20, 2017, and September 25, 2018 |
| OATT | Open Access Transmission Tariff |
| Queue Position | Defined in the NYISO Tariff, Attachment Z, as: "[t]he order of a valid Interconnection Request, Study Request, or Transmission Inter-connection Application relative to all other such pending requests, that is established based upon the date and time of receipt of the valid request by the ISO, unless specifically provided otherwise in an applicable transition rule set forth in Attachment P, Attachment X or Attachment Z to the ISO OATT." |
| Reasonable Efforts | Defined in the NYISO Tariff, Attachment Z, as: "[w]ith respect to an action required to be attempted or taken by a Party under this Agreement, efforts that are timely and consistent with Good Utility Practice and are otherwise substantially equivalent to those a Party would use to protect its own interests." |
| Rehearing Order | *Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, 177 FERC ¶ 61,121 (2021) |
| Reliability Needs Assessment | Biennial study NYISO performs to evaluate the resource and transmission adequacy and transmission system security of the New York bulk power transmission facilities |

xiii

| | |
|---|---|
| Small Generator Interconnection Procedures | NYISO procedures applicable to generators with a capacity of 20 MW or less, as provided in NYISO Tariff, Attachment Z |
| System Deliverability Upgrades | Defined in the NYISO Tariff, Attachment Z, as: "[t]he least costly configuration of commercially available components of electrical equipment that can be used, consistent with Good Utility Practice and Applicable Reliability Requirements, to make the modifications or additions to the existing New York State Transmission System that are required for the proposed Project to connect reliably to the system in a manner that meets the NYISO Deliverability Interconnection Standard for Capacity Resource Interconnection Service." |
| System Upgrade Facilities | Defined in the NYISO Tariff, Attachment Z, in relevant part as: "[t]he least costly configuration of commercially available components of electrical equipment that can be used, consistent with good utility practice and Applicable Reliability Requirements to make the modifications to the existing transmission system that are required to maintain system reliability due to: (i) changes in the system, including such changes as load growth and changes in load pattern, to be addressed in the form of generic generation or transmission projects; and (ii) proposed interconnections." |
| Tariff | NYISO Open Access Transmission Tariff |
| Transmission Owner | Defined in the NYISO Tariff as: "[t]he public utility or authority (or its designated agent) that owns facilities used for the transmission of Energy in interstate commerce and provides Transmission Service under the Tariff." |

# INTRODUCTION

This case is about the level of specificity the New York Independent System Operator, Inc. (NYISO) must provide in its Open Access Transmission Tariff (OATT or NYISO Tariff) concerning the way NYISO's constituent Transmission Owners report the composition of their existing systems to NYISO to create the Base Case for processing Interconnection Requests from new generators.[1]  Transmission Owners' systems include both distribution-level facilities subject to state regulation by the New York State Public Service Commission and transmission-level facilities subject to regulation by the Federal Energy Regulatory Commission (FERC or Commission) under the Federal Power Act (FPA).  Requests by small generators to interconnect at the distribution level are governed by New York State's Standardized Interconnection Requirements and Application Process (NYSSIR Process).  NYISO, by contrast, administers the process for new generators that seek to interconnect with the FERC-jurisdictional bulk power transmission system.  In performing that function, the NYISO Tariff requires NYISO to establish a Base Case that accounts for changes to distribution-level facilities reported by Transmission Owners; however, the NYISO Tariff does not dictate how Transmission Owners determine

---

[1] Capitalized terms not otherwise defined in this brief have the meaning set forth in the NYISO Tariff.

when distribution-level facilities are sufficiently complete to be incorporated into NYISO's Base Case for interconnection planning.

In the administrative proceeding below, Hecate Energy Greene County 3 LLC (Hecate) filed a complaint at FERC against both NYISO and Hecate's Connecting Transmission Owner, Central Hudson Gas & Electric Corp. (Central Hudson), under FPA section 206, 16 U.S.C. § 824e.  Hecate objected that its system upgrade costs for interconnecting a planned solar generator increased significantly when Central Hudson determined certain changes to existing system authorized through the state-jurisdictional NYSSIR Process were sufficiently firm to be included in NYISO's interconnection studies.  Among other things, Hecate alleged it was unlawful for NYISO to accept Central Hudson's determinations about the composition of its existing state-jurisdictional system—which Hecate calls Central Hudson's "Inclusion Practice" [2]—because Central Hudson's decision-making process was not specifically described in the NYISO Tariff.

The Commission denied Hecate's complaint.  *See Hecate Energy Greene County 3 LLC v. Central Hudson Gas & Electric Corp.*, 176 FERC ¶ 61,023 (Complaint Order), *reh'g denied by operation of law*, 176 FERC ¶ 62,124, *reh'g*

---

[2] While the Commission's brief follows Central Hudson in using the term "inclusion rule," Resp't Br. at 13-14, NYISO uses the term "Inclusion Practice" in this brief consistent with the Commission's orders and Hecate's brief.

*denied on the merits*, 177 FERC ¶ 61,121 (2021) (Rehearing Order).  FERC found that NYISO had conducted a just and reasonable interconnection process and had not violated the FPA.  On the contrary, FERC correctly found that several provisions in the NYISO tariff "broadly provide for the use of Base Case data that would include the NYSSIR Projects that Central Hudson had determined to be firm." Complaint Order at PP 48-49, JA0945; *accord* Rehearing Order at PP 46-49, JA1009-12.

Hecate's petition for review must be denied.  Hecate lacks standing because its alleged injury cannot be redressed by a favorable decision on the sole issue Hecate has preserved.  The Commission has broad discretion to determine the contents of FERC-jurisdictional tariffs and FERC did not abuse that discretion in finding that the NYISO Tariff already requires NYISO to incorporate information reported by Transmission Owners concerning the composition of their state-jurisdictional facilities.  Moreover, a contrary decision by this Court would threaten significant damage to the administration of Interconnection Requests by NYISO and other regional system operators.

## **COUNTERSTATEMENT OF JURISDICTION**

Hecate has satisfied the procedural requirements necessary to provide this Court with jurisdiction over Hecate's petition for review.  *See* Pet'r Br. at 1-3. However, Hecate's failure to challenge FERC's determination that NYISO

processed Hecate's interconnection request in a just and reasonable manner is fatal to Hecate's standing because Hecate's alleged injury cannot be redressed by granting Hecate's petition:  Hecate would still bear the system upgrade costs it seeks to avoid regardless of whether Central Hudson's Inclusion Practice is formally incorporated into the NYISO Tariff.  *See infra* at 21-23; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In addition, this Court lacks jurisdiction to consider certain arguments Hecate failed to raise in the FERC proceeding below.  *See infra* at 23-24; 16 U.S.C. § 825*l*(b); *N. Va. Elec. Coop., Inc. v. FERC*, 945 F.3d 1201, 1205 (D.C. Cir. 2019).

## STATEMENT OF ISSUES

The sole issue preserved by Hecate for judicial review is "[w]hether the Commission violated the FPA by permitting [Central Hudson and NYISO] to utilize a practice that was not specified in the [NYISO] Tariff to develop the Base Case for Hecate's facilities study and as a result assigning certain interconnection costs to Hecate."  Pet'r Br. at 5, Issue 2; *see* Hecate Rehearing Request at 4, Issue 3, JA0950.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are set forth in the addenda attached to Hecate's Petitioner Brief and FERC's Respondent Brief.  An addendum to this brief also sets forth pertinent provisions of the NYISO's Tariff, which are the "equivalent of a federal regulation."  *Cal. ex rel. Lockyer v. Dynegy, Inc.*, 375 F.3d 831, 839 (9th

4

Cir. 2004) (citation omitted); *accord In re FirstEnergy Sols. Corp.*, 945 F.3d 431, 458 (6th Cir. 2019) (Griffin, J., concurring in part) (collecting precedent).

## STATEMENT OF FACTS

### A. Statutory Overview

This matter involves two key provisions of the FPA.  The first is FPA section 201(b)(1), which provides that the Commission (1) has exclusive jurisdiction over the transmission of electric energy in interstate commerce and wholesale sales of electric energy in interstate commerce, as well as all facilities used for such transmission and wholesale sales, and (2) lacks jurisdiction over facilities used for the generation or the local distribution of electric energy.  16 U.S.C. § 824(b)(1). The second is FPA section 205(c), which requires that a public utility, "[u]nder such laws and regulations as the Commission may prescribe," file with the Commission "schedules" showing all rates for jurisdictional service, along with practices, classifications, regulations, and contracts that "affect" such rates.   16 U.S.C. § 824d(c).

At issue here is the level of detail that must be reflected in a filed rate schedule under FPA section 205(c).  The analysis of this question is impacted by the answer to a second relevant question: whether retail and distribution practices that are beyond the Commission's jurisdiction under FPA section 201 must be described in a rate schedule filed under FPA section 205(c).

5

The leading case addressing the "level of detail" required under FPA section 205(c) is this Court's decision in *City of Cleveland v. FERC*, 773 F.2d 1368 (D.C. Cir. 1985).  Describing FPA section 205(c)'s filing requirement as "amorphous," and observing that "there is an infinitude of practices affecting rates and service," the Court held that a public utility's filed tariff must include only "those practices that affect rates and service *significantly*, that are realistically *susceptible* of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous."  *Id.* at 1376.  The Court also emphasized that the Commission has "broad bounds of discretion" in implementing section 205(c), and that the question for a reviewing court is whether the level of detail in a rate schedule "fall[s] short . . . of the minimum level of specificity that the Commission could reasonably require."  *Id.*

The analytical framework described in *City of Cleveland* is known as FERC's "rule of reason," *Pac. Gas & Elec. Co.*, 5 FERC ¶ 61,305, at 61,658 (1978), and it has been refined over the decades.  Most significantly, the Supreme Court in *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260 (2016) (*EPSA*), held that practices are subject to FERC's "affecting" jurisdiction under FPA section 205 only if they "*directly* affect the wholesale rate."  *Id.* at 274 (alteration incorporated).  *EPSA* adopted this Court's analytical framework from a 2004 decision holding that the Commission lacks authority under its "affecting" jurisdiction to direct the

6

composition of a public utility's board of directors. *See Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 403 (D.C. Cir. 2004) (noting that the Commission's "affecting" jurisdiction extends to practices "that directly affect the rate or are closely related to the rate, not all those remote things beyond the rate structure that might in some sense indirectly or ultimately do so").

It is also important to note that FERC must rely on states to approve the siting and construction of transmission lines because FERC itself lacks that authority except in very limited circumstances under FPA section 216 that are not relevant here. *See* 16 U.S.C. § 824p(b) (granting FERC authority to issue "permits for the construction or modification of electric transmission facilities in a national interest electric transmission corridor designated by the Secretary" of the Department of Energy); *Piedmont Environmental Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) (rejecting FERC's assertion of authority under FPA section 216 and noting that "states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities").

## B. New York Independent System Operator (NYISO)

"[T]he bulk power transmission system in the state of New York is operated, but not owned, by . . . the New York Independent System Operator." *N.Y. Reg'l Interconnect, Inc. v. FERC*, 634 F.3d 581, 584 (D.C. Cir. 2011). With respect to the "bulk power transmission system" operated by NYISO, which consists of almost all

of the Commission-jurisdictional transmission facilities located in New York State, NYISO "provides open access transmission service and maintains system reliability." *Consol. Edison Co. of N.Y. v. FERC*, 347 F.3d 964, 966 (D.C. Cir. 2003). NYISO "also administers competitive, bid-based electricity markets and monitors them for exercises of market power." *Id.* Generator interconnection service, which is the service at issue in this appeal, is a form of open access transmission service mandated by the Commission. *See* Order No. 2003[3] at P 9 (describing the Commission's rule that "interconnection is a critical component of open access transmission service and thus is subject to the requirement that utilities offer comparable service under the OATT").

NYISO has "operational control" over the bulk power transmission system, but not physical control. Through a series of agreements among the Transmission Owners and between NYISO and the Transmission Owners, NYISO is empowered to direct the planning and operation of the bulk power transmission system in order to meet NYISO's open access transmission, reliability, and market administration responsibilities. *See Central Hudson Gas & Elec. Corp.*, 83 FERC ¶ 61,352, at

---

[3] *Standardization of Generator Interconnection Agreements and Procedures*, Order No. 2003, 104 FERC ¶ 61,103 (2003), *order on reh'g*, Order No. 2003-A, 106 FERC ¶ 61,220, *order on reh'g*, Order No. 2003-B, 109 FERC ¶ 61,287 (2004), *order on reh'g*, Order No. 2003-C, 111 FERC ¶ 61,401 (2005), *aff'd sub nom. Nat'l Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277 (D.C. Cir. 2007) (*NARUC*).

62,405, 62,413 (1998) (listing enabling agreements establishing NYISO and describing the delegation of operational control over bulk power transmission facilities to NYISO).  However, the physical control of the facilities that make up the New York bulk power transmission system remains in the hands of the Transmission Owners, and NYISO therefore relies on the Transmission Owners to perform the planning and operational tasks that can only be accomplished by an entity with physical control of the relevant facilities.  *See id.* at 62,413 (explaining that NYISO's role under its governing agreements is to "exercise operational control over transmission facilities" owned and maintained by Transmission Owners).

This separation of operational and physical control means that NYISO must rely on the Transmission Owners, which are subject to their own open access transmission and reliability mandates from the Commission, to perform certain tasks on behalf of NYISO.  In addition, NYISO relies on Transmission Owners to provide information concerning any changes to their existing systems that are subject to state jurisdiction, which NYISO uses to perform the FERC-jurisdictional analyses for which it is directly responsible.  Given the scope of NYISO's duties and its size,[4]

---

[4] NYISO has expansive responsibilities for conducting interconnection studies, allocating interconnection costs, and other matters but is a relatively small public utility.  NYISO has approximately 600 employees and an annual budget of approximately $165 million.  By comparison,  Consolidated Edison Company of New York, Inc., which is the largest of the eight transmission owning utilities whose facilities NYISO operates, reported having 12,325 employees and $9.26 billion in total operating expenses in 2021.  *See* Consol. Edison Co. of N.Y., Inc., Form 10-K

NYISO necessarily relies on Transmission Owners and others to perform certain studies, and to provide informational inputs for NYISO's own processes.

The planning and generator interconnection processes illustrate NYISO's reliance on information from Transmission Owners to perform NYISO's duties. NYISO uses two similar but distinct processes to administer generator interconnections: one for generators with a capacity of 20 MW or less (the Small Generator Interconnection Procedures), and a separate one for generators with a capacity over 20 MW (the Large Facility Interconnection Procedures). *See* Complaint Order at PP 2, 19, JA0924, 0934 (describing the small and large generator interconnection procedures). For smaller generators, the primary impacts on the bulk power transmission system are likely to be local, rather than regional. Individual Transmission Owners have much more detailed information about the configuration of their local systems than NYISO has. Thus, NYISO engages individual Transmission Owners to perform system impact studies for small generators proposing to interconnect to the Distribution System, subject to ultimate review and management by NYISO. *See* JA0483-501 (system impact study performed by Central Hudson, subject to NYISO's oversight and input, for the

---

Annual Report for the Fiscal Year Ended Dec. 31, 2021 (Feb. 17, 2022), https://sec.report/Document/0001047862-22-000039/.

Hecate facility).  This allocation of work ensures that such studies are performed both efficiently and with a maximum emphasis on ensuring reliability.

The same reliance is reflected in the development of the "Base Case" that NYISO maintains in order to perform facilities studies.  The Base Case is a model of the New York bulk power transmission system reflecting both existing system configurations and certain planned upgrades or changes to that system.  Leaving aside for the moment questions regarding how the Base Case should be updated, NYISO relies heavily on Transmission Owners when establishing the Base Case. Those Transmission Owners have much more detailed information regarding the configuration of their existing transmission systems than does NYISO, and the Base Case therefore would be much less accurate (and therefore much less reliable) if NYISO did not construct the Base Case using information from the Transmission Owners.

### C. Small Generator Interconnections in New York

Consistent with its obligation to provide open access transmission service, NYISO is responsible for overseeing and administering the process governing generator interconnections that are subject to the Commission's jurisdiction.  The Commission has long used a seven-factor test to distinguish FERC-jurisdictional transmission facilities from non-jurisdictional distribution facilities.  *See* Order

No. 888[5] at 31,771 (describing the seven-part test for distinguishing transmission facilities from distribution facilities).  The FERC-jurisdictional interconnections administered by NYISO consist of generator interconnections to lines that qualify as "transmission" under the Commission's seven-part test, as well as interconnections to facilities that otherwise would qualify as "distribution" under the seven-part test, but that will be used to make wholesale sales of electric energy in interstate commerce.  *See* Order No. 2003 at P 804 ("This Final Rule . . . applies to a request to interconnect to a public utility's 'distribution' facilities used to transmit electric energy in interstate commerce on behalf of a wholesale purchaser pursuant to a Commission-filed OATT.").

The "small" generators (*i.e.*, generators with a capacity of 20 MW or less) entering the New York market tend to interconnect to lower-voltage, distribution-level facilities.  For small generators intending to make sales of electric energy in interstate commerce, these interconnections are subject to the Commission's

---

[5]  *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996) (cross-referenced at 75 FERC ¶ 61,080), *order on reh'g*, Order No. 888-A, FERC Stats. & Regs. ¶ 31,048 (cross-referenced at 78 FERC ¶ 61,220), *order on reh'g*, Order No. 888-B, 81 FERC ¶ 61,248 (1997), *order on reh'g*, Order No. 888-C, 82 FERC ¶ 61,046 (1998), *aff'd in relevant part sub nom. Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002).

jurisdiction, and are governed by NYISO's Small Generator Interconnection Procedures. However, where a small generator interconnecting to distribution-level facilities does not intend to make FERC-jurisdictional wholesale sales, the interconnection is not subject to the Commission's jurisdiction. NYISO's Small Generator Interconnection Procedures are inapplicable to, and NYISO itself does not oversee or process, the interconnections of these Non-Jurisdictional Distributed Generation Projects. Rather, "a generator seeking to interconnect to distribution facilities that are not subject to Commission jurisdiction must follow the NYSSIR Process administered by the New York Commission or an individual utility's, such as Central Hudson's, interconnection procedures, depending on the project size." Complaint Order at P 35, JA0939 (citing NYISO Second Answer at 7, JA0921).

NYISO has no jurisdiction over, and limited visibility into, the interconnections processed under the Non-Jurisdictional Interconnection Rules. The Transmission Owners administer the Non-Jurisdictional Interconnection Rules, and the Transmission Owners therefore have significant information about the interconnection of Non-Jurisdictional Distributed Generation Projects. To account for the impact of the interconnection of Non-Jurisdictional Distributed Generation Projects on its own system, NYISO relies on periodic updates from the Transmission Owners regarding changes to their existing systems, including the impacts of generators that are proceeding under the Non-Jurisdictional Interconnection Rules.

*See* Complaint Order at PP 47-49, JA0944-45.  NYISO then incorporates these updates into its Base Case.  *See id.*

The limitations on NYISO's visibility into the Non-Jurisdictional Distributed Generation Projects proceeding under the Non-Jurisdictional Interconnection Rules are compounded by state initiatives to facilitate market entry by renewable generating resources.  In 2019, New York State enacted the Climate Leadership and Community Protection Act (Climate Act), which sets aggressive targets for carbon reduction in New York.  To meet these ambitious goals, the Climate Act also provides incentives for the market entry of renewable generating resources.  As a result of the Climate Act, the generation mix in New York State is undergoing a significant evolution, and many of the changes involve a proliferation of Non-Jurisdictional Distributed Generation Projects.  Although NYISO is required to manage the impact of the interconnections of Non-Jurisdictional Distributed Generation Projects on the bulk power transmission system, NYISO plays no role in the interconnection of those projects, and is highly reliant on the Transmission Owners to provide adequate and accurate information that will allow NYISO to discharge its own open access, reliability, and efficiency obligations.

### D. NYISO's Application of the Small Generator Interconnection Procedures to Hecate

Although NYISO's Small Generator Interconnection Procedures are structured to process proposed interconnections serially through the assignment of

14

Queue Positions, that process gives NYISO substantial flexibility to cluster proposed interconnections for study purposes. *See* NYISO Tariff, Attach. Z, § 32.1.6. A lower-queued project that is not required to proceed through all interconnection studies or that makes the necessary financial and development commitments more quickly than a higher-queued project may proceed through the Small Generator Interconnection Procedures more quickly than a higher-queued project. *See id.*, Attach. Z, § 32.3.4.2 (permitting relevant parties to agree no system impact study is required); *id.*, Attach. Z, § 32.3.5.2 (permitting relevant parties to agree to waive the facilities study), *id.,* Attach. S, § 25.5.9.1 (governing projects entering a Class Year Study); *see also id*., Attach. Z, § 32.3.5.3.2 (governing small generation projects that enter a Class Year Study). Finally, NYISO's process permits NYISO to use an iterative process during the study process, and to work with interconnecting generators to try to identify the most efficient means of interconnecting their projects.

Hecate had three small projects go through NYISO's interconnection process seeking to interconnect in close proximity on Central Hudson's distribution facilities. These projects were originally proposed as a single 50 MW solar generating project. By breaking up the original project into three smaller projects, Hecate enabled itself to use NYISO's Small Generator Interconnection Procedures.

15

Due to the complexities of the projects' nearby electrical locations and their combined contributions to impacts on Central Hudson's system, NYISO exercised its discretion to group the three Hecate projects, plus an additional solar project seeking to interconnect nearby, for purposes of conducting the system impact study for the projects. System impact studies involving multiple proposed projects maximize the efficiency of the process, and ensure that, for proposed generators interconnecting in close proximity to one another, reliability concerns are fully addressed. At the same time, clustered system impact studies can be quite complex. Such studies involve multiple proposed generators, and involve multiple iterations as NYISO and the Transmission Owner seek to clarify or acquire additional information, as the interconnecting generators seek to understand and comment on preliminary results, and as NYISO and the Transmission Operator work with the interconnecting generators to try to minimize the need for the construction of new network upgrades.

Two years is not an unreasonable processing time for a clustered system impact study, particularly where—as here—NYISO and the relevant Transmission Owner sought to work with an interconnecting customer to identify solutions to reliability issues that will not require the construction of new network upgrades. NYISO worked diligently with Hecate to identify the reliability issues that might be triggered by the interconnection of Hecate's projects, and to identify potential

solutions to reliability problems that would not require Hecate to fund new network upgrades.  *See, e.g.*, NYISO Answer at 6-9, JA0873-76 (describing outreach to Hecate); Central Hudson Answer at 10, JA0859 (same).

## SUMMARY OF THE ARGUMENT

Hecate's petitions for review must be denied because Hecate has waived arguments that are a necessary basis of its standing.  Hecate's opening brief identifies two questions in its Statement of Issues but fails to offer any arguments regarding the first, namely whether "Hecate had failed to satisfy its burden of proof under section 206 of the FPA to demonstrate that Central Hudson and NYISO acted in an unjust or unreasonable manner in administering the NYISO Tariff."  Hecate's failure to develop this argument in its brief constitutes a waiver of that argument.  That waiver is fatal to Hecate's standing because FERC's finding that Hecate had not satisfied its burden of proof is an independent basis to affirm FERC's orders below. In other words, Hecate's purported injury cannot be redressed by granting Hecate's petition, because the allocation of interconnection costs that Hecate challenges could only be overturned if Hecate prevails on its first argument, which Hecate declined to develop.

In addition, Hecate's claims regarding Attachments S and Z of the NYISO OATT must be rejected because Hecate failed to preserve them on rehearing.  If the Court reaches the substance of Hecate's arguments concerning the Commission's

application of the rule of reason, then the Court should reject Hecate's arguments on the merits.

As FERC's brief demonstrates, FERC reasonably exercised its broad discretion under FPA section 205(c) and lawfully found that NYISO was not required to expressly incorporate Central Hudson's Inclusion Practice into the NYISO OATT. Hecate is asking that NYISO be compelled to include more technical detail in its tariffs than is necessary or required under the rule of reason precedents interpreting FPA section 205(c). Hecate has misleadingly understated the specificity and complexity of NYISO's existing interconnection procedures. Adopting Hecate's version of the rule of reason would require NYISO to include an overwhelming level of additional information regarding practices that NYISO does not control or oversee. Hecate would deprive NYISO of the operational flexibility necessary to effectively administer the interconnection procedures. It would also be illogical, and potentially unlawful, for NYISO's FERC-jurisdictional tariffs to include Central Hudson's Inclusion Practice, or other provisions, that are not FERC-jurisdictional in the first place. Finally, the adverse consequences of Hecate's re-interpretation of the rule of reason would not be limited to NYISO's Interconnection Procedures. If Hecate's approach were adopted, it would threaten to make various other complex tariff processes administered by NYISO, and by the various other FERC-jurisdictional independent system operators, unworkable.

## STANDARD OF REVIEW

The Commission accurately states the standard of review, emphasizing the breadth of the Commission's discretion to determine the appropriate degree of specificity in FERC-jurisdictional tariffs under FPA section 205(c). *See* Resp't Br. at 20-21; *see also* 16 U.S.C. § 824d(c) (granting the Commission broad discretion to govern the content of jurisdictional tariffs "[u]nder such rules and regulations as the Commission may prescribe" and "within such time and in such form as the Commission may designate").

## ARGUMENT

## I. Hecate Waived Arguments Necessary to Retain Standing on Review

The Court must deny Hecate's petition for review because Hecate does not present a redressable injury. Hecate fails to develop the first of two questions presented in its statement of issues, which challenges FERC's determination that "Hecate had failed to satisfy its burden of proof under section 206 of the FPA to demonstrate that Central Hudson and [NYISO] acted in an unjust or unreasonable manner in administering the [NYISO] Tariff." Pet'r Br. at 5. Hecate's allegation of unjust and unreasonable treatment by Central Hudson and NYISO, whom Hecate alleged had failed to use Reasonable Efforts in processing Hecate's interconnection request, was the gravamen of Hecate's initial complaint at FERC and also the primary focus of Hecate's rehearing request. *See* Complaint at 2, 15, JA0002, 0015;

19

Rehearing Request at 3-4, specifications of error 1 and 2, JA0949-50. The Commission squarely rejected that argument. *See, e.g.*, Complaint Order at P 44, JA0943; Rehearing Order at PP 27-39, JA0999-1005.

NYISO diligently conducted a fundamentally fair interconnection process for each of Hecate's three solar projects that complied with all tariff requirements and properly allocated system upgrade costs caused by Hecate's third project.[6] Hecate cannot plausibly argue that NYISO's extensive efforts at accommodating its complex interconnection challenges prejudiced Hecate in any way. As the Commission found, "given the complexities of the interconnection studies required" by Hecate's complex interconnection issues "the time expended was not unreasonable" and "many of the delays were caused by Hecate itself." Complaint Order at P 44 (footnotes omitted), JA0943. Thus, "the delays experienced by Hecate do not make the existing OATT or the Respondents' actions thereunder unjust and unreasonable." *Id.* On rehearing, FERC again found that Hecate failed to satisfy its burden under FPA section 206 because (1) NYISO engaged in reasonable efforts to support Hecate's interconnection request, and (2) Hecate itself caused many of the delays and corresponding problems. Rehearing Order at PP 27-39, JA0999-1005.

---

[6] NYISO provided a detailed account of its interactions with Hecate in its pleadings below. *See* NYISO Answer at 3-18, JA0870-85; NYISO Second Answer at 3-8, JA0917-22; NYISO Answer to Rehearing Request at 3-5, JA0979-81.

On review, Hecate has waived any challenge to FERC's determination that "Hecate has failed to satisfy its burden of proof under section 206 of the FPA to demonstrate that Respondents have acted in an unjust or unreasonable manner in administering the NYISO OATT."  Complaint Order at P 40, JA0940; *accord* Rehearing Order at P 27, JA0999-1000.  Hecate abandoned that line of argument in its opening brief, which focuses exclusively on whether the FPA requires the NYISO Tariff to describe the Inclusion Practice Central Hudson employs to describe its existing system as part of the Base Case used to perform NYISO interconnection studies.  *See* Pet'r Br. at 21-39 (omitting any discussion of Reasonable Efforts).  Hecate's failure to develop the first issue listed in its opening brief is a fatal waiver.  *Xcel Energy Servs. Inc. v. FERC*, 510 F.3d 314, 318 (D.C. Cir. 2007) (citing *Power Co. of Am. v. FERC*, 245 F.3d 839, 845 (D.C. Cir. 2001)).

Hecate's abandonment of the first issue presented is fatal because FERC's determination that Hecate failed to satisfy its burden of proof is an independent and sufficient basis to affirm the Commission's orders below.  *See Fogo De Chao (Holdings) Inc. v. U.S. Dep't Homeland Sec.*, 769 F.3d 1127, 1149 (D.C. Cir. 2014) ("[W]here . . . an agency has set out multiple independent grounds for a decision, '[the Court] will affirm the agency so long as any one of the grounds is valid, unless it is demonstrated that the agency would not have acted on that basis if the alternative grounds were unavailable.'") (quoting *BDPCS, Inc. v. FCC*, 351 F.3d 1177, 1183

(D.C. Cir. 2003); *see also Doe v. McAleenan*, 929 F.3d 478, 485 (7th Cir. 2019)

("[B]ecause [the agency's] determination was based on two independent and

alternative grounds, we would have to find error in both determinations in order to

grant relief to [Petitioner].").

Here, FERC has already found that it was not unjust or unreasonable for

NYISO to perform its interconnection studies of Hecate's third solar project using a

Base Case that incorporated Central Hudson's existing system as defined by Central

Hudson's Inclusion Practice.  *See* Complaint Order at P 40, JA0940; Rehearing

Order at P 27, JA0999-1000.  Therefore, Hecate would gain nothing from a decision

by this Court remanding the Commission's orders below with directions to formally

incorporate Central Hudson's Inclusion Practice into the NYISO Tariff.

The Commission has already held that NYISO's reliance on Central Hudson's

Inclusion Practice was just and reasonable, *see id.*, and also held that NYISO was

required to use the information provided by Central Hudson pursuant to the

longstanding NYISO Tariff language now codified in NYISO Tariff Attachment S,

section 25.5.5.1(vii).  *See* Complaint Order at PP 47-49, JA0944-45; Rehearing

Order at PP 47-48, JA1009-11.  Hecate does not challenge either of those

determinations here, but instead seeks the "express specification of the 'inclusion

practice' in the NYISO OATT."  Rehearing Order at P 47, JA1009.  However, the

formal incorporation of Central Hudson's Inclusion Practice into the NYISO Tariff

through some future filing will not change the outcome for Hecate because the Commission has already held that NYISO must rely upon the information Central Hudson provided to NYISO pursuant to that utility's Inclusion Practice.

Hecate's alleged injury therefore cannot be "redressed by a favorable decision" of this Court granting Hecate's petition for review on the sole issue Hecate has preserved, *Lujan*, 504 U.S. at 561, and the Court need not consider Hecate's arguments concerning the Commission's alleged misapplication of the rule of reason. *See VHV Jewelers, LLC v. Wolf*, 17 F.4th 109, 114 (11th Cir. 2021) ("[Petitioner] needed to establish that the Agency's decision was arbitrary and capricious as to both of the independent reasons to succeed on appeal, so the district court did not consider the Agency's position regarding the [second independent issue]."); *Mendez-Alcaraz v. Gonzalez*, 464 F.3d 842, 844 (9th Cir. 2006) (holding that where an independent basis to affirm exists, a court need not reach arguments challenging the other independent bases).

## II.    Hecate's New Arguments Regarding NYISO OATT Attachments S and Z are Baseless and Were Waived when Hecate Failed to Raise Them on Rehearing

Hecate argues that Central Hudson's Inclusion Practice contravenes NYISO OATT Attachment Z (Small Generator Interconnection Procedures) and further contends that the Commission incorrectly interpreted NYISO OATT Attachment S (Rules to Allocate Responsibility for the Cost of New Interconnection Facilities**)**.

23

*See* Pet'r Br. at 29-30, 35-36.  Neither claim is properly before this Court.  Hecate

failed to raise these arguments to the Commission on rehearing and therefore

irrevocably waived them.  *See* FPA section 313(b), 16 U.S.C. § 825*l*(b) ("No

objection to the order of the Commission shall be considered by the court unless

such objection shall have been urged before the Commission in the application for

rehearing unless there is reasonable ground for failure so to do."); *see, e.g.*, *N. Va.

Elec. Coop.*, 945 F.3d at 1205 (rejecting arguments petitioner failed to raise on

rehearing) (citing *Save Our Sebasticook v. FERC*, 431 F.3d 379, 381-82 (D.C. Cir.

2005) (collecting precedent enforcing this "jurisdictional bar")).

Hecate had no "reasonable basis" under FPA section 313(b) for waiting to

introduce these arguments on review because Hecate's new tariff interpretation

claims do not respond to anything new in the Commission's Rehearing Order.  The

Rehearing Order simply reaffirms the Commission's prior interpretation of the

relevant sections in Attachment Z and Attachment S in the Complaint Order;

*Compare* Complaint Order at PP 46-50, JA0944-46, *with* Rehearing Order at PP 46-

49, JA1009-12.

Beyond that fatal jurisdictional defect, Hecate's arguments are baseless and

should be rejected on their merits if this Court reaches them.

Hecate's argument concerning Queue Position for small generators in

Attachment Z, section 32.1.6, *see* Pet'r Br. at 29-30, fails to recognize that Queue

Position rules apply only to the sequencing of interconnection Studies for FERC-jurisdictional facilities, not to the recognition of non-jurisdictional facilities in NYISO's Base Case, which is governed by Attachment S, section 25.5.5.1 (Existing System Representation).[7] Moreover, Hecate's argument concerning Attachment S, section 25.5.5.1 pointlessly quibbles about alleged inconsistencies in the terminology used to describe existing generation and transmission facilities in subsection 25.5.5.1(i), *see* Pet'r Br. at 31-32, 35-36, while failing to recognize that subsection 25.5.5.1(vii) *requires* NYISO to consider "all other changes to existing facilities . . . that are identified in the Load and Capacity Data Report or reported by Market Participants to the ISO as scheduled to occur during the five-year cost allocation study planning period."[8]

---

[7] As the Commission explained in the Complaint Order, the subsections in Attachment S, section 25.5.5 were renumbered shortly after Hecate filed its complaint. *See* Complaint Order at P 20 n.165; Resp't Br. at 13 n.3. Specifically, the previous section 25.5.5.1 was deleted as obsolete because it only applied to "Class Year 2017." Compl. Ex. HEG-0002 at 18-22, JA0220-24 (reproducing the Tariff in effect as of Mar 20, 2018). When that deletion occurred, the section addressing "Class Years subsequent to Class Year 2017" was renumbered from 25.5.5.2 to 25.5.5.1. This brief cites the relevant, renumbered provision as section 25.5.5.1.

[8] The language in current section 25.5.5.1(vii) addressing "Class Years subsequent to Class Year 2017" (formerly numbered section 25.5.5.2(vii)) is identical to the former section 25.5.5.1(vi) addressing "Class Year 2017." *Compare* Compl. Ex. HEG-0002 at 19, JA0221 *with id.* at 22, JA0224.

The Commission clearly explained the relationship between these provisions, finding that Attachment S, section 25.5.5.1(vii) requires NYISO to use the existing system data provided by Transmission Owners and that "collectively, section 32.5 of attachment Z, section 30.2.3 of attachment X, and section 25.5 of attachment S of the NYISO OATT broadly provide for the use of Base Case data that would include the NYSSIR Projects that Central Hudson had determined to be firm." Complaint Order at P 48-49, JA0945; *accord* Rehearing Order at PP 46-49 & nn.137, 140-47, JA1009-12.

### A. NYISO's Recognition of Central Hudson's Existing System in its Base Case for Hecate's Interconnection Study Did Not Violate Attachment Z, Section 32.1.6

Hecate argues that Central Hudson's Inclusion Practice violates section 32.1.6 of Attachment Z because NYISO should have used "Queue Position to determine when to include a FERC-jurisdictional Interconnection Customer's project in the Base Case study assumptions for other projects when conducting system impact studies and facilities studies pursuant to Attachment Z." Pet'r Br. at 30. Section 32.1.6 provides in relevant part:

> The Queue Position of each Interconnection Request will be used to determine the order of initiating Interconnection Studies, and the study assumptions to be used in the analyses conducted under Section 32.2 and Section 32.3 of these procedures. Provided, however, Attachment S of the ISO OATT will be used to determine the cost responsibility for any System Upgrade Facilities or System Deliverability Upgrades

> necessary to accommodate the interconnection, as required by Section
> 32.3.5.3.2 of these procedures.

NYISO Tariff, Attach. Z, § 32.1.6, JA0077-78.

Hecate's argument concerning the Queue Position provision in Attachment Z misses the mark on multiple fronts and demonstrates Hecate's misunderstanding of the NYISO Tariff. First, as required by section 32.1.6, NYISO correctly relied on Attachment S to determine Hecate's cost responsibility for necessary System Upgrade Facilities. *See* Complaint Order at PP 48-49, JA0945; Rehearing Order at P 48 & n.147, JA1011. NYISO did not contravene any Tariff provisions in determining Hecate's cost allocation, but rather implemented several interrelated Tariff provisions in a reasonable manner. *See* Complaint Order at P 49, JA0945; Rehearing Order at PP 48-49, JA1011-12. Second, because NYISO does not process Interconnection Requests for Non-Jurisdictional Projects, NYISO does not include them in its queue for FERC-jurisdictional projects. *See* Rehearing Order at P 48 & n.147, JA1011 ("[T]he 'inclusion practice' does not determine NYISO's queue processing. The existing provisions of the NYISO OATT, including the Base Case-related provisions discussed above, determine NYISO's queue processing."). NYISO appropriately does not consider Queue Position when evaluating Non-Jurisdictional Projects as part of the interconnection studies for a FERC-jurisdictional project. *See* NYISO Answer at 6-9, JA0873-76. As the Commission

27

correctly found, "NYISO does not administer individual transmission owner's interconnection processes."  Rehearing Order at P 49, JA1012.

Simply put, Hecate points to no cognizable violations of NYISO Tariff Attachment Z, section 32.1.6.

## B. NYISO's Recognition of Central Hudson's Existing System in its Base Case for Hecate's Interconnection Study Did Not Violate—But Was Instead Required By—Attachment S, Section 25.5.5.1

Hecate contends that Attachment S, section 25.5.5.1 does not provide Interconnection Customers with sufficient notice that firm generation will be included in the Base Case because section 25.5.5.1(i) "only refers to '*existing generation*' not 'firm' generation."  Pet'r Br. at 32.  That argument is both dubious and irrelevant.  Hecate fails to recognize that section 25.5.5.1(vii) also requires that NYISO consider in its Base Case "*all other changes to existing facilities* . . . that are *identified in the Load and Capacity Data Report or reported by Market Participants* to [NYISO] as scheduled to occur during the five year cost allocation study planning period."  Complaint Order at P 48, JA0945 (quoting NYISO Tariff Attach. S, section 25.5.5.1(vii)) (emphasis added).[9]  Because section 25.5.5.1(vii) plainly requires

---

[9] For the avoidance of doubt, the term Market Participants includes the NYISO's Transmission Owners.  *See* NYISO Tariff, § 1.13 ("Market Participants include: Transmission Customers under the ISO OATT, Customers under the ISO Services Tariff, Power Exchanges, *Transmission Owners*, Primary Holders, LSEs, Suppliers and their designated agents.  Market Participants also include entities buying or selling TCCs.") (emphasis added).

NYISO to consider "all other changes to existing facilities," Hecate is simply incorrect in asserting that the NYISO Tariff does not provide notice that generation and transmission facilities "identified" or "reported" by Central Hudson as firm will be included in NYISO's Base Case as the best representation of Central Hudson's existing system when NYISO conducts its interconnection studies. *See* Complaint Order at PP 48-49, JA0945.

## III. FERC Reasonably Concluded that Central Hudson's Inclusion Practice Need Not Be Expressly Incorporated in the NYISO Tariff

FERC's brief correctly describes the filing requirements under FPA section 205(c) and the rule of reason precedents thereunder. Resp't Br. at 7-8. In theory, those requirements would encompass any terms or practices that "affect" or "relate to" rates for Commission-jurisdictional service. But the long-established rule of reason policy recognizes that there are potentially an "infinitude of practices affecting rates and service." *City of Cleveland*, 773 F.2d at 1376. FERC-jurisdictional public utilities, including NYISO, must file "only those practices that affect rates and service *significantly*, that are reasonably *susceptible* of specification, and that are not so generally understood in any contractual arrangement as to render recitation superfluous." *Id.*

FERC's brief also convincingly demonstrates that FERC properly exercised its broad discretion when it determined that the Inclusion Practice need not be included in the NYISO Tariff. Resp't Br. at 21-40. FERC has likewise shown that

the *Cargill* and *Florida Municipal Power Agency* cases cited by Hecate are readily distinguishable and do not support requiring Central Hudson's Inclusion Practice to be expressly incorporated in the NYISO OATT. *Id.* at 27-34. NYISO incorporates those portions of FERC's brief as its own. Rather than reiterating FERC's arguments on these points, NYISO offers supplemental information below to support FERC's request that this Court deny Hecate's petition for review.

### A. Hecate's Rule of Reason Claims Are Fundamentally Misleading Because They Understate Both the Specificity and Complexity of NYISO's Filed Interconnection Procedures

Hecate repeatedly claims that the NYISO Tariff provisions are impermissibly "broad" and non-specific. Pet'r Br. at 18, 21-39. As FERC notes, however, "[NYISO's] Tariff already includes voluminous detail about [NYISO's] procedures for processing Interconnection Requests. The three Tariff attachments (Attachments S, X, and Z) describing those procedures are well over 100 pages each." Resp't Br. at 40. Moreover, these hundreds of pages of Tariff provisions are highly detailed and prescriptive. They direct NYISO to perform numerous actions by clearly established deadlines. The provisions of the three Attachments interact with each other in complex, overlapping ways. Far from providing NYISO with unfettered discretion, the provisions of the NYISO Tariff governing interconnections are designed to allow for flexibility to address unique project complexities requiring the application of engineering judgment. Hecate's complaints about alleged ambiguities

in a handful of provisions should not be considered in isolation. Instead, the Court should recognize that the provisions at issue in this case are part of a large complex body of fully specified tariff provisions.

On a similar note, the Court should keep in mind that Hecate's cluster of projects, for all of the difficult issues that it raised, was just one of many projects that NYISO was simultaneously evaluating as it implemented Attachments S, X, and Z. NYISO has seen a significant increase in Interconnection Requests over the last few years, primarily due to the rapid growth of renewable projects being developed in response to New York State's clean energy policies. In the past six years, the number of new Interconnection Requests has grown each year from a low of 62 new requests in 2015 to a high of 197 new requests in 2021. *See* NYISO, *NYISO Interconnection Queue 4/30/22* (Apr. 30, 2022).[10] There have been 59 new Interconnection Requests this year as of April 30, 2022. *See id.* These evaluations are also not conducted in isolation. The interactions between the assumptions and decisions made for one project or cluster of projects could impact multiple projects or clusters of projects. The time necessary to perform these studies is significant. For example, NYISO, Transmission Owners, and third-party consultants expended a total number of 11,392 hours towards interconnections studies during the first

---

[10] https://www.nyiso.com/documents/20142/1407078/NYISO-Interconnection-Queue.xlsx/b91b6960-7a16-17a2-4b21-862991469bc6.

quarter of 2022 alone. *See* NYISO, *Quarter 1 of 2022 – Large Facility Interconnection Study Metrics* at 3, § E (Apr. 29, 2022).[11]  These facts are relevant to FERC's analysis of what the rule of reason requires.

In implementing the rule of reason, FERC "balances the 'real benefits' of notice and full disclosure against any potential burden to the public utility of filing terms that do not so affect rates and services." *ISO New England Inc.*, 154 FERC ¶ 61,008, at P 32 (2016) (quoting *Midcontinent Indep. Sys. Operator, Inc.*, 152 FERC ¶ 61,073, at P 22 (2015)).  What matters is that tariffs contain enough specificity to give reasonable notice of the core features of the rules and procedures they establish.

Furthermore, the Commission has emphasized that in the case of independent and impartial entities such as NYISO that are responsible for overseeing complex tariff processes, "it is not 'appropriate to deprive utilities of the flexibility to manage their operations by introducing delay and layered decision-making.'" *Id.* (quoting *PacifiCorp*, 127 FERC ¶ 61,144, at P 11 (2009)).  The Commission has consistently emphasized that in these kinds of contexts, tariffs "need not include every implementation detail to be just and reasonable." *PJM Interconnection, L.L.C.*, 173 FERC ¶ 61,134, at P 159 (2020).  For example, with respect to its transmission

---

[11]  https://www.nyiso.com/documents/20142/12339243/LF-Interconnection-Study-Metrics-1st-Quarter-2022.pdf/8917e957-84c4-a57c-31f4-94de05302392.

planning policies, FERC "has long understood that 'study assumptions and parameters are likely to change over time as planners gain experience in implementing the new planning procedures. Thus, rigid specifications or formulas set out in the Tariff would likely lead to less reliable assessments due to the inability of planners to adapt to changing circumstances.'" *Id.* (quoting *Sw. Power Pool, Inc.*, 136 FERC ¶ 61,050, at P 37 (2011)).

FERC most recently made this point in a May 10, 2022 order in an unrelated proceeding concerning a NYISO proposal to adopt new tariff rules. *See N.Y. Indep. Sys. Operator, Inc.*, 179 FERC ¶ 61,102 (2022). The new language was designed to more accurately assess the actual reliability value provided by different categories of electric capacity resources, a topic that is, at the very least, as significant to the determination of just and reasonable rates under FPA section 205 as interconnection. The Commission found that NYISO should not be required to include every detail of its "capacity accreditation" rules in its tariffs. *Id.* P 105. FERC was clear that "the court's guidance in *City of Cleveland*, rendered with regard to a bilateral dispute between a utility and its customer about short-term electric service, rings even more true in the context of a dispute between diverse stakeholders, involving complex measurement and reliability methodologies." *Id.* P 108.

In other words, the need for a reasonable degree of practical flexibility in tariff administration is increased, not reduced, when the kinds of complex, iterative, and

overlapping processes at issue in this case are implicated. Similarly, the practical need for flexibility in administering the NYISO Interconnection Procedures will be heightened, not diminished, by the expected influx of small renewable energy generators using the Small Generator Interconnection Procedures in light of the Climate Act. FPA section 205 delegates to the Commission "particularly broad discretion" to provide for such flexibility. *City of Cleveland*, 773 F.2d at 1376. The Court should defer to the Commission's reasonable determinations in this case regarding which rules are reasonably susceptible of specification, and how much notice to potential interconnection customers is sufficient.

### B. Expressly Incorporating Central Hudson's Inclusion Practice into the NYISO OATT Would Be Illogical, Potentially Unlawful, and Would Make It Impractical for NYISO to Administer its Interconnection Procedures

Hecate asks this Court to adopt a greatly expanded interpretation of what must be on file under the rule of reason. Hecate would effectively require NYISO to include specific tariff language describing any non-FERC-jurisdictional transmission practice that might "affect" outcomes under the interconnection procedures. Central Hudson's Inclusion Practice would not be the only set of provisions that would be affected under Hecate's approach. There are various other Transmission Owner processes that have theoretical impacts on NYISO's determinations but which are not under NYISO's control or supervision.

For example, NYISO relies on inputs from Transmission Owners for purposes of developing the Base Case models that NYISO uses in its planning processes, which are described in detail in Attachment Y of the NYISO Tariff.  In particular, NYISO annually compiles two related documents, with substantial input from Transmission Owners, whose information NYISO then relies upon for modeling the NYISO transmission system.  The first such document is NYISO's annual FERC Form No. 715 filing, which contains power flow Base Case models of the NYISO system, along with diagrams of the NYISO system, an explanation of NYISO's planning criteria, and an evaluation of both the current and expected performance of the NYISO system. *See* 18 C.F.R. § 141.300.  The second is NYISO's "Gold Book," or "NYISO Load and Capacity Data Report," defined in Attachment S to the NYISO Tariff as "the annual [NYISO] survey of power demand and supply in New York State, published pursuant to Section 6-106 of the Energy Law of New York State." NYISO Tariff § 25.1.2, JA0210.

NYISO uses both its FERC Form No. 715 and the Gold Book to establish the Base Case model for, among other things, preparing the Reliability Needs Assessment that NYISO performs pursuant to its transmission planning process under Attachment Y to the NYISO Tariff.  NYISO Tariff, Attach. Y, § 31.2.2.3.2. In compiling both the FERC Form No. 715 and the Gold Book, NYISO relies heavily on Transmission Owners and other market participants for much of the necessary

information, including line ratings, power flows, loads, and electric generating capacity. Absent the Transmission Owners' cooperation, NYISO would lack the inputs necessary to complete a robust transmission planning process. *See* Complaint Order at PP 48-49, JA0945; Rehearing Order at PP 47-48, JA1009-11.

Moreover, Hecate's proposal would, as a practical matter, require that NYISO add enormous amounts of material to its Tariff. Eight Transmission Owners operate within NYISO,[12] and it would be simply infeasible for NYISO to include in its Tariff each Transmission Owner's universe of non-FERC-jurisdictional transmission, planning, and interconnection practices that potentially "affects" NYISO's interconnection procedures. And even if NYISO could capture every such instance, each time a Transmission Owner revised a practice NYISO would need to: (1) evaluate the change to determine whether it triggered the need for a new tariff revision; (2) initiate a governance process to obtain the necessary super-majority approval from all NYISO stakeholders to authorize a NYISO section 205 filing at FERC; and (3) develop a tariff amendment and obtain FERC's approval. The consequence of failing to make timely tariff changes in response to evolving Transmission Owner technical practices would be exposure to complaints at FERC,

---

[12] *See* NYISO, *Local Transmission Owner Planning Process (LTPP)*, https://www.nyiso.com/documents/20142/3632262/Local-Transmission-Owner-Planning-Process-LTPP.pdf/025b47f1-d90a-94e3-8eba-c21e7a6131aa?t=1543340865158.

like Hecate's, opportunistically accusing NYISO of acting unlawfully and seeking to overturn the results of extensive, complex studies. Such an enormous burden would constitute an insurmountable impediment to the flexibility NYISO needs as a system operator.

To be clear, NYISO's authority is limited to the matters assigned to it under its Commission-approved organic agreements with the Transmission Owners. The Transmission Owners own and physically maintain the bulk power transmission and local electric distribution systems in New York State. NYISO does not have visibility into many of their practices, including Central Hudson's Inclusion Practice, and has neither the authority nor the resources to involve itself in Transmission Owners' state-jurisdictional practices. NYISO's processes necessarily exist alongside the Transmission Owners'. It is entirely appropriate for the FERC-jurisdictional NYISO Tariff to establish that NYISO will account for the result of the Transmission Owner's state-jurisdictional interconnection activities. But there is no reason for the Transmission Owner rules to be specified in the NYISO Tariff.

In fact, it is not clear whether Transmission Owner processes, such as the Inclusion Practice could even be included in the NYISO tariff in the first place. FERC-jurisdictional tariffs describe the rules that govern the FERC-jurisdictional activities of FERC-jurisdictional transmission providers. It would be anomalous, at the very least, for the NYISO Tariff to include state-jurisdictional rules that NYISO

has no role in implementing.  It would also raise serious questions about FERC potentially accepting tariff language that it has no jurisdictional authority to enforce. For example, this Court has previously held that the Commission "clearly exceeded its statutory jurisdiction" by accepting revisions to a system operator's OATT that would have allowed "retail customers to take distribution service under a FERC tariff," which "would eviscerate state jurisdiction over numerous local facilities, in direct contravention of Congress' intent" under FPA section 201(b), 16 U.S.C. § 824(b).  *Detroit Edison Co. v. FERC*, 334 F.3d 48, 53-54 (D.C. Cir. 2003); *see also NARUC*, 475 F.3d at 1280 (explaining that *Detroit Edison* does not conflict with Order No. 2003 because that order "applies to jurisdictional transactions only").

Indeed, for the same reasons described in *Detroit Edison*, the Commission rejected an earlier joint attempt by NYISO and its member Transmission Owners to amend the NYISO Tariff in a manner that would have given the Transmission Owners a greater role in the process for interconnections to any portion of their Distribution System that is subject to FERC jurisdiction pursuant to the "independent entity variations" for interconnection procedures that FERC permitted in Order No. 2006.[13]  *See N.Y. Indep. Sys. Operator, Inc. & N.Y. Transmission*

---

[13] *Standardization of Small Generator Interconnection Agreements and Procedures*, Order No. 2006, 111 FERC ¶ 61,220, *order on reh'g*, Order No. 2006-A, 113 FERC ¶ 61,195 (2005), *order granting clarification*, Order No. 2006-B, 116 FERC ¶ 61,046 (2006).

*Owners*, 118 FERC ¶ 61,130, at P 21 (2007) (reinforcing the importance of separating interconnection responsibilities between NYISO and Transmission Owners and finding that a proposal to split responsibility under the NYISO Tariff would not "add clarity to the generator interconnection process") (citing *ISO New England, Inc.*, 115 FERC ¶ 61,050, at P 53 (2006)).

The Complaint Order at issue here noted that, in that same Order No. 2006 compliance proceeding, NYISO's compliance filing stated that "[t]he Transmission Owners will continue to administer these state-jurisdictional interconnections, and they will continue to report to NYISO any system impacts that result from such interconnections so that NYISO can incorporate these impacts into its Base Case modeling." *See* Complaint Order at P 20, JA0935 (quoting NYISO Answer at 22, JA0889 (quoting NYISO, Order No. 2006 Compliance Electric Rate Filing, Docket No. ER06-311-000, at 9 (filed Dec. 8, 2005))). Thus, Hecate cannot claim surprise that NYISO has long relied on its Transmission Owners to provide the necessary information describing their respective existing systems to create an accurate Base Case for interconnection studies. *See id.*; *see supra* note 8 (noting that the NYISO Tariff has long included the language currently found in Attachment S, section 25.5.5.1(vii)); *see also* Central Hudson Answer at 10, JA0859 (describing Central Hudson's July-August 2019 meetings and communications with Hecate and NYISO

about Central Hudson's determinations regarding "firm" facilities to implement the

utility's Inclusion Practice); NYISO Answer at 7, JA0874 (same).

### C. Hecate's Approach to the Rule of Reason Would Threaten to Make the Implementation of NYISO's Interconnection Procedures, and of Other Complex Tariff Mechanisms, Totally Unworkable

The harmful consequences of adopting Hecate's version of the rule of reason

would not be limited to NYISO's interconnection procedures or even to the bulk

power transmission system in New York.  NYISO administers various other

complex transmission service, transmission planning, and market-related systems

under is FERC-jurisdictional tariffs.  Although these rulesets are not directly at issue

in this case, they could be substantially disrupted if Hecate's overly expansive

interpretation of how much language must be expressly included in tariffs is

accepted by this Court.

The same goes for the nation's other FERC-jurisdiction independent system

operators, who are similarly tasked with running a myriad of complex and

interrelated transmission and electricity market systems.  Simply put, an order

granting Hecate its requested relief would upset reasonably settled expectations and

create an unpredictable number of unnecessary difficulties for system operators,

transmission owners, and consumers in New York and across the country.

## **CONCLUSION**

For the reasons set forth above, the petitions for review should be denied.

Respectfully submitted,

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.
*Counsel of Record*
C. Dixon Wallace III                          Ted J. Murphy
Hunton Andrews Kurth LLP              Brian M. Zimmet
Riverfront Plaza, East Tower            Hunton Andrews Kurth LLP
951 East Byrd Street                        2200 Pennsylvania Ave., NW
Richmond, VA 23219                        Washington, DC 20037
Tel: (804) 788-8200                          Tel: (202) 419-2135
dwallace@huntonak.com                  Fax: (202) 778-2201
                                                      jshepherd@huntonak.com
                                                      tmurphy@huntonak.com
                                                      bzimmet@huntonak.com

*Counsel for New York Independent System Operator, Inc.*

June 30, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this brief complies with the requirements of Rules 32(a)(5) and

32(a)(6) of the Federal Rules of Appellate Procedure because it has been prepared

in 14-point Times New Roman, a proportionally spaced font.  I further certify that

this brief complies with the type-volume limitations of D.C. Circuit Rule 32(e)

because it contains fewer than 9,100 words, excluding the parts exempted by Federal

Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), according to the

count of Microsoft Word.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for New York Independent
System Operator, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 30, 2022, I caused this brief to be electronically filed with the Clerk of this Court by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*/s/ John Lee Shepherd, Jr.*
John Lee Shepherd, Jr.

*Counsel for New York Independent
System Operator, Inc.*

## ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Nos. 21-1192 and 21-1274 (consolidated)

HECATE ENERGY GREENE COUNTY 3 LLC,
*Petitioner*,

v.

FEDERAL ENERGY REGULATORY COMMISSION,
*Respondent*.

───────────────────────

ON PETITIONS FOR REVIEW OF ORDERS OF THE
FEDERAL ENERGY REGULATORY COMMISSION

───────────────────────

## TARIFF ADDENDUM TO BRIEF OF INTERVENOR NEW YORK INDEPENDENT SYSTEM OPERATOR, INC.

───────────────────────

C. Dixon Wallace III
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200
dwallace@huntonak.com

John Lee Shepherd, Jr.
Ted J. Murphy
Brian M. Zimmet
HUNTON ANDREWS KURTH LLP
2200 Pennsylvania Ave, NW
Suite 900
Washington, DC 20037
(202) 955-1500
jshepherd@huntonak.com
tmurphy@huntonak.com
bzimmet@huntonak.com

*Counsel for New York Independent System Operator, Inc.*

June 30, 2022

# **TABLE OF CONTENTS**

Relevant Excerpts from the NYISO Tariff, Definitions ........................................ A-1

Relevant Excerpts from the NYISO Tariff, Attachment S ................................... A-2

Relevant Excerpts from the NYISO Tariff, Attachment X ............................... A-11

Relevant Excerpts from the NYISO Tariff, Attachment Y ............................... A-14

Relevant Excerpts from the NYISO Tariff, Attachment Z ............................... A-17

**Relevant Excerpts from the NYISO Tariff, Definitions**

USCA Case #21-1192     Document #1953094          Filed: 06/30/2022      Page 62 of 99

New York Independent System Operator, Inc. - NYISO OATT - Open Access Transmission Tariff (OATT) - 1 OATT Definitions - 1.13 OATT Definitions - M

## 1.13      Definitions - M

**Major Emergency State:**  An Emergency accompanied by abnormal frequency, abnormal voltage and/or equipment overloads that create a serious risk that the reliability of the NYS Power System could be adversely affected.

**Manual Dispatch:** A dispatch of the NYS Transmission System performed by the ISO when the ISO's RTD is unavailable.

**Marginal Losses:**  The NYS Transmission System Real Power Losses associated with each additional MWh of consumption by Load, or each additional MWh transmitted under a Bilateral Transaction as measured at the Points of Withdrawal.

**Marginal Losses Component:** The component of LBMP at a bus that accounts for the Marginal Losses, as measured between that bus and the Reference Bus.

**Market Participant:**  An entity, excluding the ISO, that produces, transmits, sells, and/or purchases for resale Capacity, Energy and Ancillary Services in the Wholesale Market.  Market Participants include: Transmission Customers under the ISO OATT, Customers under the ISO Services Tariff, Power Exchanges, Transmission Owners, Primary Holders, LSEs, Suppliers and their designated agents.  Market Participants also include entities buying or selling TCCs.

**Market Services:**  Services provided by the ISO under the ISO Services Tariff related to the ISO Administered Markets for Energy, Capacity and Ancillary Services.

**Member Systems:**  The eight Transmission Owners that comprised the membership of the New York Power Pool, which are: (1) Central Hudson Gas & Electric Corporation, (2) Consolidated Edison Company of New York, Inc., (3) New York State Electric & Gas Corporation, (4) Niagara Mohawk Power Corporation d/b/a National Grid, (5) Orange and Rockland Utilities, Inc., (6) Rochester Gas and Electric Corporation, (7) the Power Authority of the State of New York, and (8) Long Island Lighting Company d/b/a Long Island Power Authority.

**Minimum Generation Bid:**  A Bid parameter that identifies the payment a Supplier requires to operate a Generator at its specific minimum operating level or to provide a Demand Side Resource's specified minimum quantity of Demand Reduction. If the Supplier is a BTM:NG Resource, it shall not submit a Minimum Generation Bid.

**Minimum Generation Level:** For purposes of describing the eligibility of ten minute Resources to be committed by the Real Time Dispatch for pricing purposes pursuant to the Services Tariff, Section 4.4.3.3, an upper bound, established by the ISO, on the physical minimum generation limits specified by ten minute Resources.  Ten minute Resources with physical minimum generation limits that exceed this upper bound will not be committed by the Real Time Dispatch for pricing purposes.  The ISO shall establish a Minimum Generation Level based on its evaluation of the extent to which it is meeting its reliability criteria including Control Performance.  The Minimum Generation Level, in megawatts, and the ISO's rationale for that level, shall be made available through the ISO's website or comparable means.  If the Supplier is a BTM:NG Resource, it shall not submit a Minimum Generation Level.

**Relevant Excerpts from the NYISO Tariff, Attachment S**

**NERC Planning Standards:** The transmission system planning standards of the North American Electric Reliability Council.

**Non-Acceptance Notice:** The notice by which a Developer communicates to the ISO its decision not to accept a Project Cost Allocation or Revised Project Cost Allocation.

**Non-Financial Settlement:** The Settlement Agreement approved by FERC in Docket Nos. EL02-125-000 and EL01-125-001 addressing non-financial issues for future cost allocations.

**NPCC Basic Design and Operating Criteria:** The transmission system design and operating criteria of the Northeast Power Coordinating Council.

**NYISO Deliverability Interconnection Standard:** The standard that must be met, unless otherwise provided for by this Attachment S, by (i) any generation facility larger than 2 MW in order for that facility to obtain CRIS (ii) any Class Year Transmission Project; (iii) any entity requesting External CRIS Rights, and (iv) any entity requesting a CRIS transfer pursuant to Section 25.9.5 of this Attachment S. To meet the NYISO Deliverability Interconnection Standard, the Developer must, in accordance with these rules, fund or commit to fund any System Deliverability Upgrades identified for its Project in the Class Year Deliverability Study.

**NYISO Load and Capacity Data Report:** The annual ISO survey of power demand and supply in New York State, published pursuant to Section 6-106 of the Energy Law of New York State.

**NYISO Minimum Interconnection Standard:** The reliability standard described in Section 25.2 of this Attachment S that must be met by any Project that is subject to ISO's Large Facility Interconnection Procedures in Attachment X to the ISO OATT or the ISO's Small Generator Interconnection Procedures in Attachment Z to the ISO OATT, that is proposing to connect to the New York State Transmission System or to the Distribution System to obtain ERIS. The Standard is designed to ensure reliable access by the proposed Project to the New York State Transmission System or to the Distribution System, as applicable. The Standard does not impose any deliverability test or deliverability requirement on the proposed Project.

**NYSRC Reliability Rules:** The reliability rules of the New York State Reliability Council.

**Open Class Year:** Class Year open for new members pursuant to the Class Year Start Date deadline specified in Section 25.5.9 of this Attachment S.

**Other Interfaces:** The following Interfaces into Capacity Regions: Lower Hudson Valley [*i.e.,* Rest of State (Load Zones A-F) to Lower Hudson Valley (Load Zones G, H and I)]; New York City [*i.e.,* Lower Hudson Valley (Load Zones G, H and I) to New York City (Load Zone J)]; and Long Island [*i.e.,* Lower Hudson Valley (Load Zones G, H and I) to Long Island (Load Zone K)], and the following Interfaces between the NYCA and adjacent Control Areas: PJM to NYISO, ISO-NE to NYISO, Hydro-Quebec to NYISO, and Norwalk Harbor (Connecticut) to Northport (Long Island) Cable.

**Overage Cost:** The dollar amount by which the total cost of System Upgrade Facilities identified in the Annual Transmission Reliability Assessment exceeds the total cost of System

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 65 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 25 OATT Attachment S -
Rules To Allocate Responsibility For - 25.5 OATT Att S Class Year Study and Expedited Deliverabilit

## 25.5    Class Year Study and Expedited Deliverability Study Processes

### 25.5.1    Side Agreements

These cost allocation rules will not preclude or supersede any binding cost allocation agreements that are executed between or among Developers, Connecting Transmission Owners and/or Affected Transmission Owners; provided, however, that no such agreements will increase the cost responsibility or cause a material adverse change in the circumstances as determined by these rules of any Developer or Transmission Owner who is not a party to such agreement.

### 25.5.2    Costs Covered By Attachment S

The interconnection facility cost allocated by these rules is comprised of all costs and overheads associated with the design, procurement and installation of the new interconnection facilities.  These rules do not address in any way the allocation of responsibility for the cost of operating and maintaining the new interconnection facilities once they are installed.  Nor do these rules address in any way the ownership of the new interconnection facilities.

### 25.5.3    Dispatch Costs

Developers, Connecting Transmission Owners and Affected Transmission Owners will not be charged directly for any redispatch cost that may be caused by the temporary removal of transmission facilities from service to install new interconnection facilities, as such cost is reflected in Locational Based Marginal Prices.  Nor will existing generators be paid for any lost opportunity cost that may be incurred when their units are dispatched down or off in connection with the installation of new interconnection facilities.

**25.5.4    Transmission Owners' Cost Recovery**

Any Connecting or Affected Transmission Owner implementation and construction of (i) System Upgrade Facilities as identified in the Annual Transmission Baseline Assessment or Annual Transmission Reliability Assessment, or (ii) System Deliverability Upgrades as identified in the Class Year Deliverability Study, shall be in accordance with the ISO OATT, Commission-approved ISO Related Agreements, the Federal Power Act and Commission precedent, and therefore shall be subject to the Connecting or Affected Transmission Owner's right to recover, pursuant to appropriate financial arrangements contained in agreements or Commission-approved tariffs, all reasonably incurred costs, plus a reasonable return on investment.

**25.5.5    Existing System Representation**

The ISO shall include in the Existing System Representation for purposes of the ATBA and ATRA for a given Class Year Study or Expedited Deliverability Study:

25.5.5.1    For Class Years subsequent to Class Year 2017: (i)  the following facilities included in the ISO's most recent NYISO Load and Capacity Data Report:  all generation identified as existing and all transmission facilities identified as existing and/or firm, excluding those facilities that are subject to Class Year cost allocation but for which Class Year cost allocations have not been accepted; (ii) all proposed Projects, together with their associated System Upgrade Facilities and System Deliverability Upgrades, that have accepted their cost allocation in a prior Class Year cost allocation process; provided however, that System Deliverability Upgrades where construction has been deferred pursuant to Sections 25.7.12.2 and 25.7.12.3 of this Attachment S will only be

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 67 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 25 OATT Attachment S - Rules To Allocate Responsibility For - 25.5 OATT Att S Class Year Study and Expedited Deliverabilit

included if construction of the System Deliverability Upgrades has been triggered under Section 25.7.12.3 of this Attachment S; (iii) all generation and transmission retirements and derates identified in the Load and Capacity Data Report as scheduled to occur during the five-year cost allocation study planning period; and (iv) Transmission Projects that are proposed under Attachments Y or FF of the ISO OATT and have met the following milestones prior to the Class Year Start Date: (1) have been triggered under the Reliability Planning Process, selected under the Short-Term Reliability Process, selected under the Public Policy Transmission Planning Process, or approved by beneficiaries under the Economic Planning Process); and (2) have a completed System Impact Study; (3) have a determination pursuant to Article VII that the Article VII application filed for the facility is in compliance with Public Service Law §122 (*i.e.*, "deemed complete") (if applicable); and (4) are making reasonable progress under the applicable OATT Attachments Y or FF planning process;  (v) Transmission Projects that are not proposed under Attachments Y or FF to the ISO OATT that have completed a Facilities Study and posted Security for Network Upgrade Facilities as required in Section 22.11.1 of Attachment P to the ISO OATT and have a determination pursuant to Article VII that the Article VII application filed for the facility is in compliance with Public Service Law §122 (*i.e.*, "deemed complete") (if applicable); (vi) transmission projects not subject to the Transmission Interconnection Procedures or the Attachment X and S interconnection procedures (*i.e.*, new transmission facilities or upgrades proposed by a Transmission Owner in its Local Transmission Owner Plan or NYPA

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 68 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 25 OATT Attachment S -
Rules To Allocate Responsibility For - 25.5 OATT Att S Class Year Study and Expedited Deliverabilit

transmission plan) identified as "firm" by the Connecting Transmission Owner and either (1) have commenced a Facilities Study (if applicable) and have an Article VII application deemed complete (if applicable); or (2) are under construction and scheduled to be in-service within 12 months after the Class Year Start Date and (vii) all other changes to existing facilities, other than changes that are subject to Class Year cost allocation but that have not accepted their Class Year cost allocation, that are identified in the Load and Capacity Data Report or reported by Market Participants to the ISO as scheduled to occur during the five year cost allocation study planning period.  Facilities in a Mothball Outage, an ICAP Ineligible Forced Outage, or Inactive Reserves will be modeled as in, and not removed from, the Existing System Representation.  If the ISO has triggered multiple Transmission Projects under its Reliability Planning Process, the ISO will include in the base case the selected Transmission Project until or unless that project is halted or its Development Agreement is terminated, in which case the ISO will include in the base case the regulated backstop solution. The point of interconnection of a Retired generator with a terminated interconnection agreement is available to proposed facilities on a non-discriminatory basis pursuant to the ISO's applicable interconnection and transmission expansion processes and procedures.  A Retired generator with an interconnection agreement that remains in effect after it is Retired will retain its right to the specific point of interconnection as provided for in the interconnection agreement and access to this point will not available for new facilities.

25.5.5.2    The System Upgrade Facilities listed on Exhibit A to the Financial Settlement shall be included in the Existing System Representation. Such System Upgrade Facilities shall be shown as in service in the first year of the five-year cost allocation study planning period and in each subsequent year, unless such System Upgrade Facilities are cancelled or otherwise not in service by January 1, 2010; provided that if such facilities are expected to be in service after January 1, 2010, starting with the Class Year 2010, the ISO shall independently determine such later date when the System Upgrade Facilities are expected to be in service and represent them according to the ISO's determination.

25.5.5.3    System Upgrade Facilities not listed on Exhibit A to the Financial Settlement, but for which cost allocations have been accepted in a prior Class Year cost allocation process, shall be represented in the Existing System Representation for subsequent cost allocation studies in the year of their anticipated in-service date.

### 25.5.6    Attachment Facilities

Each Developer is responsible for 100% of the cost of the Attachment Facilities required for the reliable interconnection of its Project in compliance with the NYISO Minimum Interconnection Standard, as that responsibility is determined by these rules.

### 25.5.7    Distribution Upgrades

Each Developer is responsible for 100% of the cost of the Distribution Upgrades required for the reliable interconnection of its Project in compliance with the NYISO Minimum Interconnection Standard, as that responsibility is determined by these rules.

**25.5.8    No Prioritization of Class Year Projects or Projects in an Expedited Deliverability Study**

There will be no prioritization of (1) the Projects grouped and studied together in a Class Year; or (2) the Projects grouped and studied together in an Expedited Deliverability Study. Each Project in a Class Year Study will, with other Projects in the same Class Year, share in the then currently available functional or electrical capability of the transmission system, and share in the cost of the System Upgrade Facilities required to interconnect its respective Project and, for Developers seeking CRIS, System Deliverability Upgrades required under the NYISO Deliverability Interconnection Standard, in accordance with the rules set forth herein. Each Project in an Expedited Deliverability Study will, with other Projects in the same Expedited Deliverability Study, share in the then currently available functional or electrical capability of the transmission system in accordance with the rules set forth herein. For purposes of this Section 25.5.8, the "then currently available functional or electrical capability of the transmission system" is the functional or electrical capability of the transmission system currently available in the applicable base case.

**25.5.9    Class Year and Expedited Deliverability Study Start Date, Entry Requirements and Schedule**

**25.5.9.1    Class Year Start Date, Entry Requirements and Schedule**

The Class Year Study will begin on the Class Year Start Date, which will be the first Business Day after thirty (30) Calendar Days following the completion of the prior Class Year Study.

The ISO will provide notice of the Class Year Study Start Date by (1) sending notice of the start date to those registered through the ISO to be on the distribution lists for the NYISO

Operating Committee and its subcommittees; and (2) posting notice of the Class Year Study Start Date.

In order to become an Eligible Class Year Project, a Developer must:

(1)     elect to enter the applicable Class Year by providing notice to the ISO, together with (i) a demonstration that the Project satisfies the applicable regulatory milestones described in Section 25.6.2.3.1.1 of Attachment S or (ii) notice that it will submit a qualifying contract pursuant to Section 25.6.2.3.1 of this Attachment S or a two-part deposit consisting of $100,000 plus $3,000/MW deposit as required by Section 25.6.2.3.1, no later than five (5) Business Days following the ISO's posting of the Class Year Start Date; and

(2)     satisfy the criteria for inclusion in the next Class Year, on or before the Class Year Start Date, as those criteria are specified in Section 25.6.2.3.1 of this Attachment S, Section 32.1.1.7 of Attachment Z to the OATT or Section 32.3.5.3.2 of Attachment Z to the OATT, as applicable; and

(3)     if requesting only CRIS, have completed one of the following on or before the Class Year Start Date, as applicable: a Class Year Study for ERIS, a System Impact Study under the Small Generator Interconnection Procedures, or a utility interconnection study if the Project is not subject to the ISO interconnection procedures under Attachments X and Z.

Upon a Developer's satisfaction of the Class Year Study eligibility criteria specified in this 25.5.9.1, the ISO will tender a Class Year Study Agreement to the Developer pursuant to Section 30.8.1 of Attachment X to the OATT.  An Eligible Class Year Project that satisfies the requirements of Section 30.8.1 of Attachment X to the OATT as it relates to completion of a

Class Year Study Agreement, submission of required technical data and updated In-Service Date, Initial Synchronization Data and Commercial Operation Date, and submission of required deposits, all within 10 Business Days of the tender of the Class Year Study Agreement, will become a Class Year Project.

An Eligible Class Year Project that elects to enter a Class Year Study pursuant to this Section 25.5.9.1 but retracts its election prior to the ISO's tender of the Class Year Study Agreement will not become a member of the Class Year Study.  An Eligible Class Year Project that elects to enter a Class Year Study pursuant to this Section 25.5.9.1 but retracts its election after the ISO's tender of the Class Year Study Agreement prior to or after the deadline for execution of the Class Year Study Agreement will not become a member of the Class Year Study; however, such retraction will count as one of the two Class Year Studies that a Project may enter pursuant to Section 25.6.2.3.4 of this Attachment S.

All parties engaged in performing study work as part of the Annual Transmission Reliability Assessment and Class Year Deliverability Study (collectively, the Class Year Study) are required to use Reasonable Efforts to complete the basic required evaluations and cost estimates for Connecting Transmission Owner's Attachment Facilities, Distribution Upgrades, System Upgrade Facilities, and System Deliverability Upgrades in order that the Class Year Study can be presented to the Operating Committee for approval within twelve (12) months from the Class Year Start Date.

Through the Interconnection Projects Facilities Study Working Group and/or the Transmission Planning Advisory Subcommittee distribution lists, the ISO will provide the anticipated Class Year Schedule, including the status of and anticipated completion date of the Annual Transmission Baseline Assessment study cases.

**Relevant Excerpts from the NYISO Tariff, Attachment X**

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 74 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 30 OATT Attachment X - Standard Large Facility Interconnecti - 30.2 OATT Att X Scope and Application

**30.2        Scope and Application**

**30.2.1        Application of Standard Large Facility Interconnection Procedures**

Sections 30.2 through 30.13 apply to processing an Interconnection Request pertaining to (i) a Large Generating Facility or Class Year Transmission Project proposing to interconnect to the New York State Transmission System or to the Distribution System or (ii) an existing Large Generating Facility or Class Year Transmission Project proposing a material increase or modification requiring a new Interconnection Request pursuant to these Procedures.

**30.2.2        Comparability**

The ISO shall receive, process and analyze all Interconnection Requests in a timely manner as set forth in the Large Facility Interconnection Procedures.  As described herein, the ISO will process and analyze all Interconnection Requests with independence and impartiality, in cooperation with and with input from the Developers, Connecting Transmission Owners and other Market Participants.  The ISO will perform, oversee or review the Interconnection Studies to ensure compliance with the Large Facility Interconnection Procedures.  The ISO will use the same Reasonable Efforts in processing and analyzing Interconnection Requests from all Developers, whether or not the Large Generating Facilities or Class Year Transmission Projects are owned by a Connecting Transmission Owner, its subsidiaries or Affiliates, or others.

**30.2.3        Base Case Data**

The ISO or Connecting Transmission Owner, depending upon which of those Parties possesses the data requested, shall provide base power flow, short circuit and stability databases, including all underlying assumptions and contingency lists, to the Developer upon request.  In addition, the ISO shall maintain network models and underlying assumptions within its

possession on its secure portion of the NYISO website, which shall be accessible through a link from the OASIS.  Such network models and underlying assumptions should reasonably represent those used during the most recent Class Year Interconnection Facilities Study and be representative of current system conditions used in the interconnection studies.  All Parties shall treat Confidential Information in accordance with Section 30.13.1 of these Large Facility Interconnection Procedures.  The ISO and Connecting Transmission Owner are permitted to require that Developers and password-protected website users sign a non-disclosure agreement before the release of Confidential Information or Critical Energy Infrastructure Information in the Base Case Data.  The power flow, short circuit and stability data bases and underlying assumptions, hereinafter referred to as Base Cases, provided shall be those that the ISO is using in the Annual Transmission Baseline Assessment then in progress, or if such data bases are not available, the data bases from the last completed Annual Transmission Reliability Assessment conducted pursuant to Attachment S of the ISO OATT prior to the request or posting to the secure portion of the NYISO website.  In the case of a request from a Developer considering or requesting CRIS, the power flow data bases provided shall include the Annual Transmission Reliability Assessment case from the most recently completed Class Year Deliverability Study.

### 30.2.4    No Applicability to Transmission Service or Other Services

Nothing in these Large Facility Interconnection Procedures shall constitute a request for Transmission Service or confer upon a Developer any right to receive Transmission Service. Nothing in these Large Facility Interconnection Procedures shall constitute a request for, nor agreement to provide, any energy, Ancillary Services or Installed Capacity under the ISO Services Tariff, except to the extent that a Developer's election of Capacity Resource Interconnection Service and satisfaction of the NYISO Deliverability Interconnection Standard

are prerequisites for the Large Generating Facility to become a qualified Installed Capacity

Supplier and for the Class Year Transmission Project to receive Unforced Capacity

Deliverability Rights.

**Relevant Excerpts from the NYISO Tariff, Attachment Y**

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 78 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 31 OATT Att Y New York
ISO Comprehensive System Planning Pro - 31.1 OATT Att Y New York Comprehensive System Planning Proce

proposed to address an identified Reliability Need, congestion identified in the Economic Planning Process, or a transmission need driven by a Public Policy Requirement pursuant to Order No. 1000 and the provisions of this Attachment Y.

**IPTF:** The Interregional Planning Task Force, or any successor ISO stakeholder working group or committee, designated to fulfill the functions assigned to the IPTF in this tariff.

**ISO/RTO Region:** One or more of the three ISO or RTO regions known as PJM, ISO-New England, and NYISO, which are the "Parties" to the Interregional Planning Protocol.

**ISO/TO Reliability Agreement:** The *Agreement Between the New York Independent System Operator, Inc., and the New York Transmission Owners on the Comprehensive Planning Process for Reliability Needs*, as filed with and accepted by the Commission in *New York Independent System Operator, Inc.*, 109 FERC ¶ 61,372 (2004) and 111 FERC ¶ 61,182 (2005) in Docket No. ER04-1144, and as amended or supplemented from time to time, or any successor agreement thereto.

**LCR:** An abbreviation for the term Locational Minimum Installed Capacity Requirement, as defined in the ISO Open Access Transmission Tariff.

**Loss of Load Expectation ("LOLE"):** A measure used to determine the amount of resources needed to minimize the possibility of an involuntary loss of firm electric load on the New York State Bulk Power Transmission Facilities.

**LTP:** The Local Transmission Owner Plan, developed by each Transmission Owner, which describes its respective plans that may be under consideration or finalized for its own Transmission District.

**LTP Dispute Resolution Process ("DRP"):** The process for resolution of disputes relating to a Transmission Owner's LTP set out in Section 31.2.1.3.

**LTPP:** The Local Planning Process conducted by each Transmission Owner for its own Transmission District.

**Management Committee:** The standing committee of the ISO of that name created pursuant to the ISO Agreement.

**Merchant Transmission Facility** shall mean a Developer's proposed new transmission facility that will interconnect to the New York State Transmission System or a proposed upgrade—an

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 79 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 31 OATT Att Y New York
ISO Comprehensive System Planning Pro - 31.2-31.2.7 OATT Att Y Reliability Planning Process

### 31.2.2.3    Preparation of the Reliability Needs Assessment

31.2.2.3.1    The ISO shall evaluate bulk power system needs in the RNA over the

Study Period.

31.2.2.3.2    The starting point for the development of the RNA Base Case will be the

system as defined for the FERC Form No. 715 Base Case.  The ISO shall develop

this system representation to be used for its evaluations of the Study Period by

primarily using: (1) the most recent NYISO Load and Capacity Data Report

published by the ISO on its web site; (2) the most recent versions of ISO

reliability analyses and assessments provided for or published by NERC, NPCC,

NYSRC, and neighboring Control Areas; (3) information reported by neighboring

Control Areas such as power flow data, forecasted load, significant new or

modified generation and transmission facilities, and anticipated system conditions

that the ISO determines may impact the BPTFs; and (4) data submitted pursuant

to paragraph 31.2.2.4 below; *provided, however*, the ISO shall not include in the

RNA Base Case an Interim Service Provider, an RMR Generator, or any other

interim Short-Term Reliability Process Solution selected by the ISO pursuant to

USCA Case #21-1192      Document #1953094          Filed: 06/30/2022      Page 80 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 31 OATT Att Y New York
ISO Comprehensive System Planning Pro - 31.2-31.2.7 OATT Att Y Reliability Planning Process

Attachment FF of the ISO OATT; *provided, further*, the ISO will include in the

RNA Base Case a permanent transmission Short-Term Reliability Process

Solution selected by the ISO pursuant to Attachment FF of the ISO OATT if it

meets the base case inclusion requirements in the ISO Procedures.  The details of

the development of the RNA Base Case are contained in the ISO Procedures.  The

RNA Base Case shall also include Interregional Transmission Projects that have

been approved by the NYPSC transmission siting process and meet the base case

inclusion requirements in the ISO Procedures.

**Relevant Excerpts from the NYISO Tariff, Attachment Z**

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 32 OATT Att Z Small Generator Interconnection Procedures (SG - 32.1 OATT Att Z Application

### 32.1.6    Queue Position

The ISO shall assign a Queue Position based upon the date- and time-stamp of the Interconnection Request.  The Queue Position of each Interconnection Request will be used to determine the order of initiating Interconnection Studies, and the study assumptions to be used in the analyses conducted under Section 32.2 and Section 32.3 of these procedures.  Provided, however, Attachment S of the ISO OATT will be used to determine the cost responsibility for any System Upgrade Facilities or System Deliverability Upgrades necessary to accommodate the interconnection, as required by Section 32.3.5.3.2 of these procedures.  The ISO shall maintain a single interconnection queue that combines Interconnection Requests evaluated under these procedures and those evaluated under Attachment X to the OATT.  Interconnection Requests may be studied serially or in clusters for the purpose of the system impact study or facilities study.  The ISO may evaluate Small Generating Facilities moving forward in the same time frame that contribute to Local System Upgrade Facilities to determine their *pro rata* cost responsibility for such Local System Upgrade Facilities.  Small Generating Facilities evaluated in a cluster study that trigger non-Local System Upgrade Facilities must be evaluated in a Class Year Interconnection Facilities Study pursuant to Section 32.3.5.3.2 of this Attachment Z.

### 32.1.7    Interconnection Requests Submitted Prior to the Effective Date of the SGIP

Nothing in this SGIP affects an Interconnection Customer's Queue Position assigned before the effective date of this SGIP.  The Parties agree to complete work on any interconnection study agreement executed prior to the effective date of this SGIP in accordance with the terms and conditions of that interconnection study agreement.  Any new studies or additional work will be completed pursuant to this SGIP.

and Connecting Transmission Owner a draft interconnection agreement within five (5) Business Days.

32.3.3.7    If the optional feasibility study shows the potential for adverse system impacts, the review process shall proceed to the system impact study.

### 32.3.4    System Impact Study

32.3.4.1    The Interconnection Customer shall advise the ISO that it elects to proceed with a system impact study within five (5) Business Days after either the delivery of the final optional feasibility study report to the Interconnection Customer or the scoping meeting, if the Interconnection Customer opts to forego the optional feasibility study.  As soon as practicable after receipt of such election from the Interconnection Customer, the ISO shall provide to the Interconnection Customer and Connecting Transmission Owner a good faith estimate of the cost and timeframe for completing the system impact study.

A system impact study shall identify and detail the electric system impacts that would result if the proposed Small Generating Facility were interconnected without project modifications or electric system modifications, focusing on the adverse system impacts identified in the optional feasibility study, or to study potential impacts, including but not limited to those identified in the scoping meeting.  A system impact study shall evaluate the impact of the proposed interconnection on the reliability of the electric system.

32.3.4.2    If the ISO, Connecting Transmission Owner and Interconnection Customer mutually agree that no system impact study is required, , the ISO shall send the Interconnection Customer and the Connecting Transmission Owner a

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 84 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 32 OATT Att Z Small
Generator Interconnection Procedures (SG - 32.3 OATT Att Z Study Process

facilities study agreement (in the form of Appendix 6) as soon as practicable after (1) transmittal of the final optional feasibility study report; or (2) confirmation that the ISO, Connecting Transmission Owner and Interconnection Customer mutually agree to waive the system impact study if the Interconnection Customer elects to skip the optional feasibility study. The ISO shall include, with the facilities study agreement tendered to the Interconnection Customer, an outline of the scope of the facilities study and a non-binding good faith estimate of the cost and timeframe to perform the study.

32.3.4.3    In order to remain under consideration for interconnection, unless the system impact study is waived upon mutual agreement of the ISO, Connecting Transmission Owner and Interconnection Customer, the Interconnection Customer must submit the required system impact study deposit set forth in Section 32.3.4.4 of this Attachment Z and the technical data requested by the ISO to the ISO within fifteen (15) Business Days of the ISO's notice of good faith estimate of the cost and timeframe to perform the system impact study.

32.3.4.4    A deposit of $50,000 for the system impact study must be submitted by the Interconnection Customer within fifteen (15) Business Days of the ISO's notice of good faith estimate of the cost and timeframe to perform the system impact study to the Interconnection Customer. If the Interconnection Customer does not provide the required study deposit within fifteen (15) Business Days after the ISO's notice to the Interconnection Customer and the Connecting Transmission Owner of the good faith estimate of the cost and timeframe for completing the SIS, the Interconnection Customer will be subject to withdrawal.

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 85 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 32 OATT Att Z Small
Generator Interconnection Procedures (SG - 32.3 OATT Att Z Study Process

If the Interconnection Customer does not provide all required technical data, the ISO shall notify the Interconnection Customer of the deficiency and the Interconnection Customer shall cure the deficiency within ten (10) Business Days of receipt of the notice, provided, however, such ability to cure technical deficiencies does not apply to failure to submit the required deposit.  The ISO shall notify the Interconnection Customer and the Connecting Transmission Owner that the system impact study has commenced following receipt of the required deposit and once the ISO deems the required technical data sufficient.

32.3.4.5    The scope of and cost responsibilities for a system impact study shall be described in the  system impact study scope.  The scope of the system impact study will be provided to the Interconnection Customer and Connecting Transmission Owner for review and comment.  After the study scope is finalized, the ISO will provide the final scope to the Connecting Transmission Owner and the Interconnection Customer. The Connecting Transmission Owner shall indicate its agreement to the system impact study scope by signing it and promptly returning it to the ISO, such agreement not to be unreasonably withheld.  For an Interconnection Customer proposing an incremental increase in output to an existing Small Generating Facility, the total output of which does not exceed 20 MW, the system impact study scope may be narrowed upon mutual agreement among the ISO, Connecting Transmission Owner and Interconnection Customer.

32.3.4.6    The ISO may request additional information from the Interconnection Customer and Connecting Transmission Owner as may reasonably become necessary consistent with Good Utility Practice during the course of the system

impact study.  Upon request from the ISO for additional information required for or related to the system impact study, Interconnection Customer and Connecting Transmission Owner shall provide such additional information in a prompt manner.

32.3.4.7    Affected Systems shall participate in the system impact study and provide all information necessary to prepare the study.

32.3.4.8    Connecting Transmission Owner and any Affecting Transmission Owners, together with Interconnection Customer, will be provided drafts of the system impact study report for review.  Review and comments shall be provided to the ISO within fifteen (15) Business Days of receipt.

**32.3.5    Facilities Study**

32.3.5.1    If a system impact study(s) is required, once the required system impact study(s) is completed, a system impact study report shall be prepared by the ISO and transmitted to the Interconnection Customer and the Connecting Transmission Owner.  As soon as practicable after transmittal of the final system impact study report, the ISO will tender a facilities study agreement to the Interconnection Customer and Connecting Transmission Owner .  If a system impact study(s) is not required, the NYISO shall provide the Interconnection Customer and the Connecting Transmission Owner with a facilities study agreement as soon as practicable after that determination.  Each facilities study agreement shall include an outline of the scope of the facilities study and a non-binding good faith estimate of the cost and timeframe to perform the facilities study.

32.3.5.2       In order to remain under consideration for interconnection, unless the ISO, Connecting Transmission Owner and Interconnection Customer mutually agree to waive the facilities study, the Interconnection Customer must return the completed facilities study agreement within 30 Calendar Days, together with the required technical data set forth in Appendix 6 and the required deposit equal to the non-binding good faith estimate of the cost and timeframe to perform the facilities study.  The Interconnection Customer, ISO and Connecting Transmission Owner shall execute the facilities study agreement no later than ten (10) Business Days after the ISO confirms receipt of the executed facilities study agreement, the study deposit and required technical data from the Interconnection Customer.  The ISO shall provide a copy of the fully executed facilities study agreement to the Interconnection Customer and Connecting Transmission Owner.

32.3.5.3       The facilities study shall specify and estimate the cost of the equipment, engineering, procurement and construction work (including overheads) needed to implement the conclusions of the system impact study(s), as appropriate. Connecting Transmission Owner and any Affecting Transmission Owners, together with the Interconnection Customer, will be provided with drafts of the facilities study report for review.  Review and comments shall be provided to the ISO within fifteen (15) Business Days of receipt.

32.3.5.3.1       The Interconnection Customer shall be responsible for the cost of the Interconnection Facilities and Distribution Upgrades necessary to accommodate its Interconnection Request.

32.3.5.3.2    The Interconnection Customer shall be responsible for the cost of any

System Upgrade Facilities determined by an Interconnection Study to be

necessary to accommodate the Interconnection Request.  Such Interconnection

Study shall be of sufficient detail and scope to assure that this determination can

be made.  If any System Upgrade Facilities other than Local System Upgrade

Facilities are determined to be necessary to accommodate the Interconnection

Request, the Small Generating Facility shall be evaluated as a member of the next

Class Year, and the Interconnection Customer's cost responsibility shall be

determined in accordance with Attachment S.  All other Small Generating

Facilities (i.e., those for which no System Upgrade Facilities or only Local

System Upgrade Facilities have been identified as necessary to accommodate the

Interconnection Request) shall complete an individual Facilities Study, if

required, under these Small Generator Interconnection Procedures; provided

however, a Small Generating Facility that requires no System Upgrade Facilities

or only Local System Upgrade Facilities may elect to enter a Class Year Study for

evaluation of its requested ERIS and elective System Upgrade Facilities, to the

extent permitted by Section 25.6.1.4.1 of Attachment X to the OATT.   The

standard described above in this Section regarding when a Small Generating

Facility must enter a Class Year will apply to Small Generating Facilities being

considered for entry into Class Year 2011 and beyond.  To the extent appropriate,

the ISO will notify any Affected System or transmission owner prior to the

determination that System Upgrade Facilities are necessary, to allow for potential

input by the Affected System or transmission owner. For purposes of this section,

Affected System may include the portions of the New York State Transmission System that may be potentially affected.  If the Interconnection Customer elects CRIS, and its Small Generating Facility is larger than 2 MW, it will be evaluated as a member of the next Class Year to determine the Interconnection Customer's responsibility for System Deliverability Upgrades in accordance with Attachment S.

32.3.5.3.3    At any time prior to the Class Year Start Date, as specified in Section 25.5.9 of Attachment S to the OATT, the Interconnection Customer may elect to proceed under this Section 32.3.5.3.3.  Pending the outcome of the Class Year cost allocation process, the Interconnection Customer can elect to proceed with the interconnection of its Small Generating Facility if in the SGIA (i) it agrees in writing to accept the final cost allocation results determined in the Class Year in accordance with Attachment S, (ii) it agrees in writing to pay cash or post Security in accordance with Attachment S in that Class Year; and (iii) it agrees in writing to operate its Small Generating Facility within the limits of the current New York State Transmission System, as determined by the ISO, in consultation with the Connecting Transmission Owner; pursuant to Section 32.3.5.3.4 of the SGIP.

32.3.5.3.4    Upon the request and at the expense of the Interconnection Customer, the ISO, in consultation with the Connecting Transmission Owner, will perform operating studies on a timely basis to determine the extent to which the Interconnection Customer's Small Generating Facility can be operated prior to the installation of any System Upgrade Facilities or System Deliverability Upgrades

required for that Small Generating Facility.  Such tests shall be consistent with
Applicable Reliability Standards and Good Utility Practice.  To the extent
appropriate, the ISO will notify any Affected System or transmission owner prior
to the determination to allow for potential input by the Affected System or
transmission owner.  For purposes of this section, Affected System may include
the portions of the New York State Transmission System that may be potentially
affected.  The ISO and Connecting Transmission Owner shall promptly notify the
Interconnection Customer of the results of these studies and shall permit the Small
Generating Facility to operate consistent with the results of such studies.

32.3.5.4        Design for any required Interconnection Facilities and/or Upgrades shall
be performed under the facilities study agreement, these procedures and, if
applicable, Attachment S of the ISO OATT.  The ISO may contract with
consultants to perform activities required under the facilities study agreement.
The Parties may agree to allow the Interconnection Customer to separately
arrange for the design of some of the Interconnection Facilities.  In such cases,
facilities design will be reviewed and/or modified prior to acceptance by the
Connecting Transmission Owner, under the provisions of the facilities study
agreement.  If the Parties agree to separately arrange for design and construction,
and provided security and confidentiality requirements can be met, the ISO and/or
Connecting Transmission Owner shall make sufficient information available to
the Interconnection Customer in accordance with confidentiality and critical
infrastructure requirements to permit the Interconnection Customer to obtain an
independent design and cost estimate for any necessary facilities.

32.3.5.5    A deposit of the good faith estimated costs for the facilities study will be required from the Interconnection Customer.

32.3.5.6    The scope of and cost responsibilities for the facilities study are described in the facilities study agreement in the form of Appendix 6. ISO may request additional information from the Interconnection Customer and Connecting Transmission Owner as may reasonably become necessary consistent with Good Utility Practice during the course of the facilities study. Upon request from the ISO for additional information required for or related to the facilities study, the Interconnection Customer and Connecting Transmission Owner shall provide such additional information in a prompt manner.

32.3.5.7    As soon as practicable upon completion of the facilities study, and with the agreement of the Interconnection Customer to pay for Interconnection Facilities and Upgrades identified in the facilities study, the ISO shall provide the Interconnection Customer and the Connecting Transmission Owner a draft interconnection agreement.

32.3.5.8    With the completed facilities study agreement, the Interconnection Customer shall submit to the ISO an updated proposed In-Service Date, an updated proposed Initial Synchronization Date and an updated proposed Commercial Operation Date every ninety (90) Calendar Days.

**32.5      Appendices**

**Appendix 1 - Glossary of Terms**

   Terms used in the SGIP or SGIA with initial capitalization that are not defined in this

Glossary shall have the meanings specified in Attachment X or Attachment S to the ISO OATT,

or in Section 2 of the ISO Services Tariff.

**10 kW Inverter Process** – The procedure for evaluating an Interconnection Request for a certified inverter-based Small Generating Facility no larger than 10 kW that uses the Section 32.2 screens.  The application process uses an all-in-one document that includes a simplified Interconnection Request, simplified procedures, and a brief set of terms and conditions.  See SGIP Appendix 5.

**Affected System** – An electric system other than the transmission system owned, controlled or operated by the ISO or Connecting Transmission Owner that may be affected by the proposed interconnection.

**Affected System Operator** – Affected System Operator shall mean the operator of any Affected System.

**Affected Transmission Owner** – The New York public utility or authority (or its designated agent) other than the Connecting Transmission Owner that: (i) owns facilities used for the transmission of Energy in interstate commerce and provides Transmission Service under the Tariff, and (ii) owns, leases or otherwise possesses an interest in a portion of the New York State Transmission System where System Deliverability Upgrades, System Upgrade Facilities, or Network Upgrade Facilities are or will be installed pursuant to Attachment P, Attachment X, Attachment Z, or Attachment S to the ISO OATT.

**Applicable Reliability Standards** – The criteria, requirements and guidelines of the North American Electric Reliability Council, the Northeast Power Coordinating Council, the New York State Reliability Council and related and successor organizations, and the Transmission District to which the Interconnection Customer's Small Generating Facility is directly interconnected, as those criteria, requirements and guidelines are amended and modified and in effect from time to time; provided that no Party shall waive its right to challenge the applicability of or validity of any criterion, requirement or guideline as applied to it in the context of Attachment Z to the ISO OATT.  For the purposes of the SGIP, this definition of Applicable Reliability Standards shall supersede the definition of Applicable Reliability Standards set out in Attachment X to the ISO OATT.

**Base Case** – The base case power flow, short circuit, and stability data bases used for the Interconnection Studies by the ISO, Connecting Transmission Owner or Interconnection Customer; described in Section 30.2.3 of the Large Facility Interconnection Procedures.

**Business Day** – Monday through Friday, excluding federal holidays.

**Capacity Resource Interconnection Service ("CRIS")** – The service provided by the ISO to Interconnection Customers that satisfy the NYISO Deliverability Interconnection Standard or that are otherwise eligible to receive CRIS in accordance with Attachment S to the ISO OATT; such service being one of the eligibility requirements for participation as an ISO Installed Capacity Supplier.

**Class Year** shall mean the group of Projects included in any particular Class Year Interconnection Facilities Study (Annual Transmission Reliability Assessment and/or Class Year Deliverability Study), in accordance with the criteria specified in Attachment S and in Attachment Z for including such Projects.

**Class Year Project** shall mean an Eligible Class Year Project with an executed Class Year Interconnection Facilities Study Agreement that thereby becomes one of the group of generation and Class Year Transmission Projects included in any particular Class Year Interconnection Facilities Study (Annual Transmission Reliability Assessment and/or Class Year Deliverability Study), in accordance with the criteria specified in Attachment S and in Attachment Z for including such Projects.

**Class Year Transmission Project** shall mean a Developer's proposed new transmission facility that will interconnect to the New York State Transmission System or a proposed upgrade—an improvement to, addition to, or replacement of a part of an existing transmission facility—to the New York State Transmission System, for which the Developer is eligible to request and does request Capacity Resource Interconnection Service, subject to the eligibility requirements set forth in the ISO Procedures. Class Year Transmission Projects shall not include Attachment Facilities, Network Upgrade Facilities, System Upgrade Facilities or System Deliverability Upgrades.

**Class Year Start Date** shall mean the deadline for Eligible Class Year Projects to enter a Class Year Interconnection Facilities Study, determined in accordance with Section 25.5.9 of Attachment S.

**Commercial Operation** shall mean the status of a Small Generating Facility that has commenced generating electricity for sale, excluding electricity generated during Trial Operation.

**Commercial Operation Date** of a Small Generating Facility shall mean the date on which the Small Generating Facility commences Commercial Operation as agreed to by the Parties.

**Connecting Transmission Owner** – The New York public utility or authority (or its designated agent) that: (i) owns facilities used for the transmission of Energy in interstate commerce and provides Transmission Service under the Tariff, (ii) owns, leases or otherwise possesses an interest in the portion of the New York State Transmission System or Distribution System at the Point of Interconnection, and (iii) is a Party to the Standard Small Generator Interconnection Agreement.

**Distribution System** – The Transmission Owner's facilities and equipment used to distribute electricity that are subject to FERC jurisdiction, and are subject to the ISO's Large Facility Interconnection Procedures in Attachment X to the ISO OATT or Small Generator

USCA Case #21-1192    Document #1953094    Filed: 06/30/2022    Page 95 of 99

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 32 OATT Att Z Small Generator Interconnection Procedures (SG - 32.5 OATT Att Z Appendices

Interconnection Procedures in Attachment Z to the ISO OATT under FERC Order Nos. 2003 and/or 2006.  For the purpose of the SGIP, the term Distribution System shall not include LIPA's distribution facilities.

**Distribution Upgrades** – The modifications or additions to the Transmission Owner's existing Distribution System at or beyond the Point of Interconnection that are required for the proposed Project to connect reliably to the system in a manner that meets the NYISO Minimum Interconnection Standard.  Distribution Upgrades do not include Interconnection Facilities or System Upgrade Facilities or System Deliverability Upgrades.

**Eligible Class Year Project:**  Any Project that: (1) satisfies the criteria for inclusion in the next Class Year Interconnection Facilities Study, as those criteria are specified in Sections 25.5.9 and 25.6.2.3.1 of Attachment S to the OATT, Section 32.1.1.7 of this Attachment Z and/or Section 32.3.5.3.2 of this Attachment Z; or (2) that seeks evaluation in a Class Year Study to obtain or increase CRIS as permitted by Attachment S to the ISO OATT and satisfies the criteria for inclusion in the next Class Year Interconnection Facilities Study specified in Section 25.5.9 of Attachment S to the OATT.

**Energy Resource Interconnection Service** – The service provided by the ISO to interconnect the Interconnection Customer's Small Generating Facility to the New York State Transmission System or Distribution System in accordance with the NYISO Minimum Interconnection Standard, to enable the New York State Transmission System to receive Energy and Ancillary Services from the Small Generating Facility, pursuant to the terms of the ISO OATT.

**Fast Track Process** – The procedure for evaluating an Interconnection Request for a certified Small Generating Facility that meets the eligibility requirements of Section 32.2.1 of the SGIP and includes the Section 32.2 screens, customer options meeting, and optional supplemental review.

**Force Majeure** – Any act of God, labor disturbance, act of the public enemy, war, insurrection, riot, fire, storm or flood, explosion, breakage or accident to machinery or equipment, any order, regulation or restriction imposed by governmental, military or lawfully established civilian authorities, the absence of any necessary governmental approvals timely applied for, or any other cause beyond a Party's control.  A Force Majeure event does not include an act of negligence or intentional wrongdoing.  For the purposes of this Attachment Z, this definition of Force Majeure shall supersede the definitions of Force Majeure set out in Section 2.11 of the ISO OATT.

**Good Utility Practice** – Any of the practices, methods and acts engaged in or approved by a significant portion of the electric industry during the relevant time period, or any of the practices, methods and acts which, in the exercise of reasonable judgment in light of the facts known at the time the decision was made, could have been expected to accomplish the desired result at a reasonable cost consistent with good business practices, reliability, safety and expedition.  Good Utility Practice is not intended to be limited to the optimum practice, method, or act to the exclusion of all others, but rather to be acceptable practices, methods, or acts generally accepted in the region.

**Governmental Authority** – Any federal, state, local or other governmental regulatory or administrative agency, court, commission, department, board, or other governmental subdivision, legislature, rulemaking board, tribunal, or other governmental authority having jurisdiction over the Parties, their respective facilities, or the respective services they provide, and exercising or entitled to exercise any administrative, executive, police, or taxing authority or power; provided, however, that such term does not include Interconnection Customer, the ISO, Affected Transmission Owner, Connecting Transmission Owner or any Affiliate thereof.

**Initial Synchronization Date** shall mean the date upon which the Small Generating Facility is initially synchronized and upon which Trial Operation begins.

**In-Service Date** shall mean the date upon which the Interconnection Customer reasonably expects it will be ready to begin use of the Connecting Transmission Owner's Interconnection Facilities to obtain back feed power.

**Interconnection Customer** – Any entity, including the Connecting Transmission Owner or any of its affiliates or subsidiaries, that proposes to interconnect its Small Generating Facility with the New York State Transmission System or the Distribution System.

**Interconnection Facilities** – The Connecting Transmission Owner's Interconnection Facilities and the Interconnection Customer's Interconnection Facilities.  Collectively, Interconnection Facilities include all facilities and equipment between the Small Generating Facility and the Point of Interconnection, including any modification, additions or upgrades that are necessary to physically and electrically interconnect the Small Generating Facility to the New York State Transmission System or the Distribution System.  Interconnection Facilities are sole use facilities and shall not include Distribution Upgrades or System Upgrade Facilities.

**Interconnection Request** – The Interconnection Customer's request, in accordance with these procedures, (i) to interconnect a new Small Generating Facility to the New York State Transmission System or the Distribution System, or (ii) to materially increase the capacity of, or make a material modification to the operating characteristics of, an existing Small Generating Facility that is interconnected to the New York State Transmission System or the Distribution System.  For the purposes of this Attachment Z, this definition of Interconnection Request shall supersede the definition of Interconnection Request set out in Attachment X to the ISO OATT. For purposes of the Interconnection Request, a facility comprised of multiple Generators behind the same Point of Injection (as defined in Section 1.16 of the ISO OATT) will be considered a single Small Generating Facility, provided the Interconnection Request identifies a single Interconnection Customer.

**Interconnection Study** – Any study required to be performed under Sections 32.2 or 32.3 of the SGIP.

**Local System Upgrade Facilities** shall mean the System Upgrade Facilities necessary to physically interconnect a proposed Project to the Connecting Transmission Owner's transmission system, consistent with applicable interconnection and system protection design standards. Local System Upgrade Facilities include any electrical facilities required to make the physical connection (e.g., a new ring bus for a line connection or facilities required to create a new bay

for a substation connection). Local System Upgrade Facilities also include any system protection or communication facilities that may be required for protection of the Connecting Transmission Owner's transmission facility (line or substation) involved in the interconnection. Local System Upgrade Facilities do not include System Upgrade Facilities required to mitigate any adverse reliability impact(s) of the Project(s) identified through analysis such as power flow, short circuit, or stability (e.g., replacement of a circuit breaker at a nearby substation that becomes overdutied as a result of the Project(s)).

**Material Modification** – A modification that has a material adverse impact on the cost or timing of any Interconnection Request with a later queue priority date.

**Minor Modification** – Modifications that will not have a material adverse impact on the cost or timing of any Interconnection Request.

**New York State Transmission System -** The entire New York State electric transmission system, which includes (i) the Transmission Facilities under ISO Operational Control; (ii) the Transmission Facilities Requiring ISO Notification; and (iii) all remaining transmission facilities within the New York Control Area.

**NYISO Deliverability Interconnection Standard** – The standard that must be met, unless otherwise provided for by Attachment S to the ISO OATT, by any of the following requesting CRIS: (i) any generation facility larger than 2MW; (ii) any Class Year Transmission Project; (iii) any entity requesting External CRIS Rights, and (iv) any entity requesting a CRIS transfer pursuant to Section 25.9.5 of Attachment S to the ISO OATT. To meet the NYISO Deliverability Interconnection Standard, the Interconnection Customer must, in accordance with the rules in Attachment S to the ISO OATT, fund or commit to fund any System Deliverability Upgrades identified for its Project in the Class Year Deliverability Study.

**NYISO Minimum Interconnection Standard** – The reliability standard that must be met by any Large Facility that is subject to ISO's Large Facility Interconnection Procedures in Attachment X to the ISO OATT or Small Generating Facility that is subject to the ISO's Small Generator Interconnection Procedures in this Attachment Z, that is proposing to connect to the New York State Transmission System or Distribution System, to obtain ERIS. The Minimum Interconnection Standard is designed to ensure reliable access by the proposed Project to the New York State Transmission System or to the Distribution System. The Minimum Interconnection Standard does not impose any deliverability test or deliverability requirement on the proposed interconnection.

**Open Class Year** – The Class Year open for new members pursuant to the Class Start Date deadline specified in Section 25.5.9 of Attachment S to the OATT.

**Party or Parties** – The ISO, Connecting Transmission Owner, Interconnection Customer or any combination of the above.

**Point of Interconnection** – The point where the Interconnection Facilities connect with the New York State Transmission System or the Distribution System.

**Project**: The proposed facility as described in a single Interconnection Request, to the extent permitted by Attachments X or Z to the ISO OATT, as applicable.  For facilities not subject to the ISO's Large Facility Interconnection Procedures in Attachment X to the ISO OATT or Small Generator Interconnection Procedures in Attachment Z to the ISO OATT, the Project refers to the facility as described in a single Class Year Study Agreement or Expedited Deliverability Studies Agreement, to the extent permitted by Attachment S to the ISO OATT.

**Queue Position** – The order of a valid Interconnection Request, Study Request, or Transmission Interconnection Application relative to all other such pending requests, that is established based upon the date and time of receipt of the valid request by the ISO, unless specifically provided otherwise in an applicable transition rule set forth in Attachment P, Attachment X or Attachment Z to the ISO OATT.

**Retired:** A Generator that has permanently ceased operating on or after the effective date of Section 5.18 of the Services Tariff either: i) pursuant to applicable notice; or ii) as a result of the expiration of its Mothball Outage or the expiration of its ICAP Ineligible Forced Outage.

**Small Generating Facility** – The Interconnection Customer's facility, no larger than 20 MW for the production and/or storage for later injection of electricity identified in the Interconnection Request if proposing to interconnect to the New York State Transmission System or Distribution System, but shall not include (i) facilities proposing to simply receive power from the New York State Transmission System or the Distribution System; (ii) facilities proposing to interconnect to the New York State Transmission System or the Distribution System made solely for the purpose of generation with no wholesale sale for resale nor to net metering; (iii) facilities proposing to the New York State Transmission System or the Distribution System made solely for the purpose of net metering; (iv) facilities proposing to interconnect to LIPA's distribution facilities; and (v) the Interconnection Customer's Interconnection Facilities.  A facility comprised of multiple Generators will be treated as a single Small Generating Facility if all Generators within the facility are behind the same Point of Interconnection, even if such Generators are different technology types.

**Study Process** – The procedure for evaluating an Interconnection Request that includes the Section 32.3 scoping meeting, feasibility study, system impact study, and facilities study.

**System Deliverability Upgrades** – The least costly configuration of commercially available components of electrical equipment that can be used, consistent with Good Utility Practice and Applicable Reliability Requirements, to make the modifications or additions to the existing New York State Transmission System that are required for the proposed Project to connect reliably to the system in a manner that meets the NYISO Deliverability Interconnection Standard for Capacity Resource Interconnection Service.

**System Upgrade Facilities** – The least costly configuration of commercially available components of electrical equipment that can be used, consistent with good utility practice and Applicable Reliability Requirements to make the modifications to the existing transmission system that are required to maintain system reliability due to:  (i) changes in the system, including such changes as load growth and changes in load pattern, to be addressed in the form of generic generation or transmission projects; and (ii) proposed interconnections.  In the case of

New York Independent System Operator, Inc. - NYISO Tariffs - Open Access Transmission Tariff (OATT) - 32 OATT Att Z Small
Generator Interconnection Procedures (SG - 32.5 OATT Att Z Appendices

proposed interconnections, System Upgrade Facilities are the modifications or additions to the existing New York State Transmission System that are required for the proposed Project to connect reliably to the system in a manner that meets the NYISO Minimum Interconnection Standard.

**Trial Operation** shall mean the period during which Interconnection Customer is engaged in on-site test operations and commissioning of the Small Generating Facility prior to Commercial Operation.

**Upgrades** – The required additions and modifications to the Connecting Transmission Owner's portion of the New York State Transmission System or the Distribution System at or beyond the Point of Interconnection.  Upgrades may be System Upgrade Facilities or System Deliverability Upgrades or Distribution Upgrades.  Upgrades do not include Interconnection Facilities.